## KROGER GROCERY & BAKING CO. v. RETAIL CLERKS' INTERNATIONAL PROTECTIVE ASS'N, LOCAL NO. 424, et al.

(District Court, E. D. Missouri, E. D. March 22, 1918.)

1. INJUNCTION ⬡2—FEDERAL COURTS—CLAYTON ACT—CONSTRUCTION AND SCOPE.

Clayton Act Oct. 15, 1914, c. 323, § 20, 38 Stat. 738 (Comp. St. 1916, § 1243d), which prohibits the granting by federal courts of injunctions to restrain certain acts in connection with disputes between employers and employés, does not have the effect of legalizing any act which was previously unlawful.

2. INJUNCTION ⬡101(1)—FEDERAL COURTS—UNLAWFUL ACTS BY STRIKING EMPLOYÉS.

The action of employés of a company conducting 140 retail grocery stores in St. Louis, in going on a strike at a time when they knew it would necessitate the closing for the time of a majority of the stores, and would result in the loss of a large quantity of perishable foodstuffs (which in fact amounted to $36,000 in value), in afterward entering the stores and using opprobrious epithets and threatening language to the employés, and in congregating in numbers in front of the stores and using harsh, offensive, and insulting language to customers and intending customers, many of whom were women and children, to enforce a boycott, *held* unlawful, and to authorize a federal court to grant an injunction, under Clayton Act Oct. 15, 1914, c. 323, § 20, on the ground that it was "necessary to prevent irreparable injury to property, or to a property right," of the employer, and also because such acts were in violation of the Food Conservation Act Aug. 10, 1917, c. 53, § 4, which makes it unlawful "knowingly to commit waste or willfully to permit preventable deterioration of any necessaries in or in connection with their production, manufacture, or distribution," or to conspire or combine "to restrict distribution of any necessaries."

3. INJUNCTION ⬡138—LIABILITY OF MEMBERS—UNLAWFUL ACTS OF OTHER MEMBERS.

Where unlawful acts of violence were committed by members of a trade union for the purpose of successfully attaining the objects of a strike, which, when reported to the union, were commended by the presiding officer and were apparently approved by all other members, all

members were equally responsible for such acts, and subject to injunction against their repetition.

**4. INJUNCTION ⊂⇒138—UNLAWFUL ACTS OF STRIKING EMPLOYÉS—ACCOMPLICES.**

One who was not a member of a trade union, whose members were conducting a strike by unlawful methods. but a competitor of the employer against which the strike was directed, and who encouraged such acts, contributed to the funds of the strikers, and offered to pay a further sum if they would close the store opposite his own, was an accomplice in the unlawful acts, and subject to an inclusion in an injunction restraining the same.

**5. CONSPIRACY ⊂⇒23—ACTS CONSTITUTING.**

An agreement of two or more persons to do an unlawful act or to do a lawful act by unlawful means, is an unlawful conspiracy.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Conspiracy.]

In Equity. Suit by the Kroger Grocery & Baking Company against the Retail Clerks' International Protective Association, Local No. 424, and others. On motion for preliminary injunction. Injunction granted.

Walter H. Saunders, of St. Louis, Mo., for plaintiff.
Chester H. Krum, of St. Louis, Mo., for defendants.

TRIEBER, District Judge (orally). The right of wage-earners to organize themselves into unions for the purpose of bettering their conditions is a right which no one can question. There can be no doubt that, but for these organizations, the conditions of wage-earners would have been much less endurable than they are at the present time. The law recognizes them, and has never questioned their right to exist. Nor can any one question the right of any employés to quit their employment, whether they do it singly or collectively, whether it is done for a good reason or without any cause, and no court can compel any man to work against his will. But it is a right which may cause great injury, injury to the wage-earners in the loss of their wages, injury to their employers in the loss of their business, and generally the greatest loss falls upon those who are the least responsible for it, the innocent public. For this reason it is a weapon that should never be used, unless all efforts of conciliation, either by conference or by arbitration, have failed.

This is especially true in times like these, when the nation is engaged in a great struggle which may affect its existence. Probably 2,000,000 of men and women have been taken from their usual vocations to engage in this great struggle. The government is dependent upon the work of wage-earners and manufacturers in order to carry this war to success, and, while the court is not willing to say that an unjustifiable strike in times like this is treason, it comes mighty close to it, morally. But the courts cannot act as arbitrators, and they have no right to pass upon strikes, whether they are justified or not. The courts, especially the courts of the United States, can only act according to the laws of the country, and their powers are limited to what

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Congress has seen proper to grant to them. The courts of the United States, inferior to the Supreme Court, it is hardly necessary to say to those who are familiar with our form of government, are mere creatures of Congress; they are not created by the Constitution, and the powers which they possess are only those which have been, either expressly or by necessary implication, granted to them by Congress. Congress has the right at any time to withdraw these powers, and, if it sees proper to do so, it may abolish the courts, inferior to the Supreme Court, altogether.

There are certain acts which have been declared by the courts, from time immemorial, to be unlawful. In the latest case decided by the Supreme Court (Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. ——, in which the opinion was delivered at the present term of that court), it was held that it was unlawful to intentionally do that which is calculated in the ordinary course of events to damage, and which does in fact damage, another person's property or rights, and therefore is actionable. In that case, the court held that for persons to interfere between employer and employés, by inducing the employés to leave their employment and thereby injure the business of the employer, is unlawful, and actionable; for persons to attempt to prevent persons from dealing with another is an unlawful act, and is actionable. Since the issues which were decided in that case arose, Congress enacted October 14, 1914 what is known as the Clayton Act (38 Stat. 730–737). By that act Congress has seen proper to limit the powers of courts of the United States, sitting as courts of equity, to grant injunctions in disputes between employers and employés, except in certain cases. Section 20 of that act says:

"That no restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employés, or between employers and employés, or between employés, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law."

The effect of the acts charged in this complaint, if true, certainly affect the property of the plaintiff and its property rights, and in view of the allegations in the complaint, which are not denied in the answer, that a judgment at law would be inadequate, because it could not be collected from any of the defendants, brings it within that provision that "there is no adequate remedy at law." That act goes further and says:

"And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor [no such relief is asked], or from recommending, advising or persuading others by peaceful means so to do, or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working, or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do."

And the act proceeds:

"Or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or others moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes, or from doing any act or thing which might lawfully be done in the absence of dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

[1] It is a mistake to suppose that by these provisions of the act any act or acts, which were unlawful at the time the act was passed, were legalized. The only effect of this act is to prevent United States courts, sitting as courts of equity, from granting injunctions in the cases mentioned therein; but so far as the legality of the acts is concerned, if they were illegal at that time, they are illegal to-day, and if the plaintiff has been damaged thereby, he may obtain from the courts any remedy which could have been obtained before that time, except an injunction. Paine Lbr. Co. v. Neal, 244 U. S. 459–471, and dissenting opinion of Mr. Justice Pitney, loc. cit. 483, 37 Sup. Ct. 718, 720, 61 L. Ed. 1256.

[2] Now the questions to be determined in this action are whether these defendants did induce or attempt to induce any employés of the plaintiff to leave their employment by force, threats, or intimidation, or did they attempt merely to persuade them peacefully. That is the first question. It is useless for the court to review all of the testimony in this case; but the court is satisfied from the great preponderance of the testimony that these acts of the defendants were not quiet and peaceable—that they used language which would naturally have an intimidating effect on those to whom it was uttered. Whether they meant to carry out these threats is wholly immaterial. The question we are concerned with is: What was the effect on those persons to whom they were applied? Another thing the evidence shows is that harsh terms, approbrious epithets, were used towards these employés. They were called "scabs." One man was called "Kaiser," and while, ordinarily, that could hardly be deemed an insulting term, yet, considering the conditions now prevailing in the minds of the public towards the Emperor of Germany, who is generally alluded to as "the Kaiser," we know it was intended as a term of insult, and not of commendation. The court finds from the evidence that the efforts made to induce the employés of the plaintiff to quit their employment were not made in a peaceful manner, but were by threats, insulting language, and intimidation.

The same finding must be made in relation to the attempted boycott. So far as the distribution of the circulars is concerned, they had a perfect right to distribute them, if it was done peaceably. They had a perfect right to say to persons who were in the habit of trading in the stores: "I wish you would not trade there; we have been clerks employed there, and have not been treated fairly; we have not been receiving wages that will allow us to live properly when the cost of living is so high; if you people will stand by us, and refuse to trade with these people until they grant us the relief to which we think we are justly entitled," they may do so. That would not have been illegal,

so as to justify an injunction, under the Clayton Act. But the evidence shows that the picketing was not done in that manner; they congregated on the sidewalks in large numbers. The evidence shows that some very harsh language was used towards some of those who did not want to comply with their requests. An old gentleman said he was called by one of the young boys who distributed circulars a name which was so vile that he did not care to repeat it, and which the court did not deem necessary to have repeated. He said it was a very insulting epithet, for which he had him arrested, but did not want him prosecuted. The entrance to the store was blocked, so that people who started to go in there could not go in. The evidence shows that most of the customers of the store were women and children, children sent by their parents to buy things, and women who would buy the necessaries of life at these stores—a class of people who are easily intimidated, who would naturally object to trading in stores where they are liable, if not injured in person, to have insulting language used by some of the pickets, which was of such a nature as to be offensive to the ears of any persons, especially women and children. These facts have been established beyond question. So the court is of the opinion, and so finds, that the attempt to prevent people from trading there was not done in a peaceable manner, but was done by threats and intimidation, and practically, I may say, violence.

Now, there is another thing. While the law does not prohibit them meeting at any place where they may lawfully meet, it does not authorize them to meet where they are not authorized to meet. A store, it is true, is to some extent a public place; but it is a public place only for those who go there for the purpose of making purchases, for the purpose of making sales, for the purpose of examining the goods, even if they do not buy them—in short, to go there for the purpose of transacting business. It may be conceded that people may go in there who do not want to transact business, for the purpose of conversing or speaking with some employé; but they have no right to go there for the purpose of doing an unlawful act—that is, to attempt to induce employés to leave their employer and thereby practically ruin the business of the employer. The evidence shows, and some of the defendants admitted that they did go there, and did talk to the employés for the sole purpose of inducing them to join their union. On the other hand, the evidence on the part of the plaintiff shows that, when they came there, they tried, in some instances, to force them to leave the stores, threatened them, and in many instances called them opprobrious names. This is conclusive that they went there for an unlawful purpose.

Counsel for the defendants says they went there to induce them to join the union, and not for the purpose of quitting the service. But from the moment the strike was declared, which was on Friday morning, from that moment any member of that union was, by the rules and regulations of the union, required to quit the employment of this plaintiff. The strike was caused by reason of the failure of the manager of the plaintiff corporation to subscribe immediately to the contract presented to him, wherein it was provided, among other things,

that no person should be employed unless he was a member of the union, or became a member of the union within 30 days; otherwise, the contract would be void, and the strike renewed. Of course, that means only one thing; that as long as the strike lasted every employé in the plaintiff's store would be required to leave their employ the moment he became a member of the union, because, as has been testified, any member of the union who would continue to work there, or would accept employment after that, would immediately be expelled, and we know a union strike would be a futile and foolish thing if the members disregarded its rules and failed to strike when ordered to do so.

The next question is: Were the acts of the defendants unlawful by reason of the fact that by ordering this strike, and inducing so many of the employés of the plaintiff to withdraw from employment, 85 of the 140 retail stores of this plaintiff had to be closed by reason of the strikes, causing a loss of the value of $36,000 of perishable food, such an unlawful act as would justify the court, in view of the Food Conservation Act of Congress, to grant the writ of injunction. That act provides:

"That it is unlawful under this act for any person or persons to knowingly commit waste or willfully to permit preventable deterioration of any necessaries in or in connection with their production, or distribution."

And furthermore it makes it an offense for any person to restrict the distribution of any necessaries, or do anything whereby transportation, producing, harvesting, manufacturing, supply, or dealing in any necessaries of life is interfered with. If these defendants, by reason of their acts, caused a loss of all this perishable food, they were certainly guilty of a violation of this act, and in the opinion of the court it would be wholly immaterial whether it was done by violence, threats, intimidation, or otherwise. The owner of this perishable food would be entitled to the aid of a court of equity of the United States to restrain them from acts which will cause still greater destruction of such food. The evidence shows that this plaintiff, in every one of the stores, dealt in meats, butter, eggs, vegetables, oleomargarine, lard, and other perishable goods; that they were also bakers, and dealt in breads, cakes, pies, and pastries; and, of course, these defendants, who had been employés of the plaintiff, knew these facts, and they must have known that, if the stores were closed, especially on Friday and Saturday, that these food products would naturally deteriorate, if not altogether spoil and be wasted.

The court is not willing to believe that the strike was called on Friday for the reason that they knew there would be more perishable goods on Friday and Saturday, which could not be carried over Sunday, and that caused them to strike on that day, as claimed by counsel for plaintiff. The court is unwilling to ascribe to these defendants such a despicable, willful act. They are as much interested in the production and in the cheapness of food as anybody; in fact, more so than people of large means. I believe they never gave it any thought; at least, I am unwilling to believe that they started the strike on that day on that account, but rather believe it took them some days before they could organize the union, and it took some few days before

they could proselyte among the employés of the plaintiff and induce a sufficient number to join them, so as to prevent the opening of the stores. But that they knew that would be the result as to the perishable goods the court finds.

The court is somewhat in doubt whether there is any evidence which justifies it in finding that there was any interference with interstate commerce. The evidence shows that plaintiff did considerable interstate business before that time, but there is nothing to show that during the time the stores were closed there was any interstate business offered to them. There is nothing to show that they received any mail orders during that time which required the shipment of goods to the state of Illinois, where, I believe, they testified they do most of their interstate business. There is nothing to show that there was any interference with any goods to be shipped to, or which were received by rail at their warehouse from, other states, and for that reason the court finds that there is nothing to indicate that there was any interference with interstate commerce. There were threats to interfere with the delivery of the goods at the stores, and, while there is no evidence here to show that there was any actual interference, it finds that, by reason of threats in the course of deliveries to the stores, no attempt was made to make such deliveries.

[3, 5] Now, there is one other question which is of considerable importance. The evidence connects only a part of the defendants with these unlawful acts. But there is no question of law better settled than that an agreement of two or more persons to do an unlawful act, or to do a lawful act by unlawful means, is an unlawful conspiracy, and the act of any one person, who is a party to that agreement, any overt act to carry out its objects, the objects of the unlawful agreement, before the object of the conspiracy has been abandoned, is the act of every member thereof. The evidence shows that all of the defendants, with the exception of two, to whom I shall refer later, were members of this union. Some of the speeches made at the meetings, as shown by the evidence, certainly indicate that there was an attempt to inflame the minds and arouse the passions and prejudices of the members against the plaintiff. While it is true that there is nothing to show that any of the speakers directed them to commit any acts of violence, on the contrary, the language used was always to act in a peaceful and quiet manner, yet the evidence shows that many of them did not do so, and when reports were made that so many stores had been closed it seemed to meet the approval of all. The chief organizer, who presided at the meeting, Mr. Baker, commended them for what they had accomplished; a man named Sargeant, although not a member of this union, told them to continue to work until they had closed every one of the stores of the plaintiff, as that was the only way the employers could be induced to do justice to their employés.

But, no matter what advice was given, acts of violence were committed by members of the union. They were committed for the purpose of carrying out successfully the object of the union, that is, to secure a successful strike, or otherwise to put the plaintiff out of business, and every member of that union, the defendants here, is equally re-

sponsible for the acts of the others. No evidence has been introduced to show that any of those, who committed any of the acts and which were reported to the union, were reproved, or their actions disapproved, by the officers of the union or any of the members; so the court finds that each of the members of this organization is just as responsible for the unlawful acts of those who committed them as if they had done them in person, and for this reason the temporary injunction must go against all of them, or against none. The court is of the opinion that the temporary injunction should issue against all members of the union who are defendants in this case.

[4] We now come to the defendant Cohn and the Meadow Brook Grocery Company. It seems that, after the strike had been ordered, Mr. Cohn, although not a member of this union, did aid and encourage them to commit the acts which were committed. The evidence shows that on one occasion he said he would give $100 if they would close up the store of the plaintiff opposite his own store. Of course, this man was not interested in the welfare of the employés, or the success of the strike so far as it affected the employés; but what he was interested in was his own business, hoping, by reason of the closing of the competitor's store, he would do more business.

There was also evidence introduced tending to show that some pickets in front of that store were advising people who wanted to go into the plaintiff's store not to go there, because it was unfair to labor, and advised them to go to Cohn's store, who was fair to labor. He was present at the meetings when reports were made, and he contributed $25. So far as this contribution is concerned, there would, ordinarily, be nothing wrong in it. If he sympathized with the employés in a strike, and he believed the employés were suffering, and he was willing to contribute some money to relieve them, there would be nothing wrong in that, and it would not be aiding them, so far as they acted unlawfully; but he attended their meetings, and told them to go ahead, and before that time he had offered the sum of $100 if they would succeed in closing up the stores of the plaintiff. That moment he made himself an accomplice of those who were engaged in this unlawful action, and is just as liable as they are, and for that reason there is no reason why the injunction should not go against him.

As to the Meadow Brook Grocery Company, there is no evidence that justifies an injunction against it. Perhaps it was not a proper thing, from a moral standpoint, to distribute the boycott circulars; but people will frequently do things from selfishness that are not exactly ethical, yet not in violation of any law. They distributed circulars, which under the Clayton Act may be done, if done peaceably, and therefore does not justify an injunction.

For these reasons the injunction against the Meadow Brook Grocery will be denied, but the temporary injunction against the other parties will be granted, upon the execution by the plaintiff of a bond in the sum of $10,000, conditioned that it will pay to the defendants, or any of them, the damage which they, or either of them, may sustain by reason of the temporary injunction, if on final hearing it shall be held that it was wrongfully granted.