UNITED STATES v. NORRIS et al.

(District Court, N. D. Illinois, E. D.    December 16, 1918.)

No. 1387.

1. MONOPOLIES ⬤⟿12(1) — COMBINATIONS AND CONSPIRACIES — ANTI-TRUST
LAWS.
   Clayton Act Oct. 15, 1914, § 20, legalizes orderly and peaceful strikes
"involving or growing out of a dispute concerning terms or conditions
of employment," and takes combinations or agreements to bring about
such strikes out of the purview of section 1 of Sherman Act July 2, 1890,
but has no application to irregular or malicious strikes, having no rela-
tion to such disputes.

2. MONOPOLIES ⬤⟿31—CONSPIRACY IN RESTRAINT OF INTERSTATE COMMERCE
—INDICTMENT.
   An indictment under Sherman Act July 2, 1890, § 1, for conspiracy in
restraint of interstate commerce, which alleged the things which were to
be done by defendants, held sufficient, although it did not charge the
means by which they were to be accomplished.

3. MONOPOLIES ⬤⟿31—CONSPIRACY IN RESTRAINT OF INTERSTATE COMMERCE
—INDICTMENT.
   Since an overt act is not an element of the offense of conspiracy un-
der Sherman Act July 2, 1890, § 1, it need not be charged in the indict-
ment.

Criminal prosecution by the United States against Michael Norris,
John Haley, and John Lynch. On motions in arrest of judgment.
Overruled.

Charles F. Clyne, U. S. Dist. Atty., and Robt. T. Neill, Special U. S.
Dist. Atty., both of Chicago, Ill.

David D. Stansbury, of Chicago, Ill., for defendants Haley and Nor-
ris.

Cruice & Langille, of Chicago, Ill., for defendant Lynch.

SANBORN, District Judge. [1] The indictment filed January 26,
1915, charges a conspiracy to violate section 1 of Sherman Act July
2, 1890, c. 647, 26 Stat. 209 (Comp. St. § 8820), denouncing conspira-
cies in restraint of interstate commerce and making any such viola-
tion a misdemeanor. It was found after the passage of the Clayton
Act, effective October 15, 1914 (38 Stat. 730, c. 323), but describes
an alleged conspiracy formed before the adoption of the latter act. My
construction of section 20 of the Clayton Act (Comp. St. § 1243d) is
that it legalizes regular and proper strikes by trade unions, and takes
combinations or agreements to bring about that class of strikes out of
the purview of section 1 of the Sherman Act, but that it does not apply
to irregular or malicious strikes, those not entered into for the better-
ment of labor conditions. The section in question provides that no re-
straining order or injunction shall issue in any case between employer
and employé, involving or growing out of a dispute concerning terms or
conditions of employment, unless necessary to prevent irreparable in-
jury to property or property right, nor for peaceful picketing, or
paying strike benefits. The second paragraph of section 20 provides

that no injunction shall prohibit any person from quitting work, advising or peacefully persuading others to do so, or peacefully persuading or communicating information, or peaceful boycotting, peaceful assembly, etc.

"Nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

The strike in this case had nothing to do with a dispute over wages, as the jury found; so the Clayton Act is entirely inapplicable. I think that section 20 was intended to legalize lawful strikes, and peaceful, lawful persuasion of workmen. The orders which were issued to workmen in this case were dishonest and corrupt, and they were given no reason for their ceasing work. The statute has no application to such a situation. The Sherman Act is thus left in full force in cases like this. The Clayton Act does not authorize molestation of employés by strikers. Kroger Grocery, etc., Co. v. Retail, etc., Co. (D. C.) 250 Fed. 890. Nor does it apply to an unlawful act like a secondary boycott. United States v. King (D. C.) 250 Fed. 908.

[2] The most serious objection to the indictment is that it does not inform defendants of the nature of the charge against them. It states that McLaughlin Building Material Company was doing an interstate commerce business; that on June 24 and 25, 1914, a large number of unloaded cars in such business were in Chicago; that certain other like cars of materials arrived in Chicago June 24 and 25; that some cars had reached their destination for unloading, others which, on account of the interference of defendants to be alleged, were in the railroad yards on other than unloading tracks, and still others, on account of such interference, were diverted in Chicago while en route to their destination, to persons other than the McLaughlin Company, and to places in Chicago other than those to which consigned. Then follows a complete list of the cars, showing carrier, contents, place and date of shipment, and date of arrival or diversion in Chicago. The interstate commerce character of the business is then alleged, and that the McLaughlin Company and the railroads were engaged in such commerce under section 1 of the Sherman Act.

It is then alleged that on June 23, 1914, defendants unlawfully and knowingly conspired together and engaged in a conspiracy in restraint of interstate commerce, which conspiracy "was a conspiracy for restraining interstate trade and commerce of said McLaughlin Building Material Company and said railroads in the several ways and by the several means now here set forth and described": (1) By preventing the hauling of sand, etc. (2) By causing the sand, etc., to remain upon and in the cars in the possession of said railroad companies so transporting the materials to their destination which materials were then in interstate commerce, "said defendants planned and intended to prevent the delivery of said materials contained in said cars." It also states that defendants did prevent such delivery. (3) By influencing and causing the persons employed to unload and haul the sand, etc., not to do so.

While it is not directly charged that defendants agreed to obstruct commerce by preventing delivery of the cars or material to the Mc-

Laughlin Company, yet that is plainly what it means, so that the only fair criticism is that the means or mode of operation do not appear in any way. How were the "preventing," causing to remain on the cars before their delivery to the building company, the "influencing" and "causing" the workmen not to unload—how were all these things to be done? What authority did defendants have over the haulers or unloaders, or over the railroads, to keep the loaded cars in their possession? If the indictment had disclosed (as the proof was) that defendants were business agents of labor unions, and as such had authority over the members, and that they influenced them to quit work, all would have been quite clear.

But there is nothing to show what influence defendants could have with the workmen, that there was any strike, that defendants levied blackmail on McLaughlin and called a strike to bring him to time, that the workmen quit, and that this caused the railroads to reroute the material cars, as a direct result. Not one of these things is even hinted at. The prosecution could equally well have proved threats to kill the workmen if they hauled for McLaughlin, or persuasion or any other form of influence. A labor dispute over wages with a teaming company for whom the teamsters worked, causing a lawful strike, might have been shown, and this was attempted by the defense. Defendants were in no way informed of the details of what they were required to meet and prepare to disprove. They were given no hint that they would be charged with collecting $2,000 blackmail from McLaughlin, and calling a strike on him because he refused to pay $500 more, or to comply with a later demand for $5,000.

The question is, therefore, whether this indictment can be held sufficient under the liberal rule now existing. Defendants have raised the question in every possible way, by demurrer, motion to dismiss and discharge on the trial, motion to direct a verdict, motion to quash, and finally in arrest.

[3] Indictments under the Sherman Act are more simple than those under Rev. St. § 5440 (Comp. St. § 10201), because the offense is the agreement alone, no overt act being a part of it. The agreement being the crime, that must be charged, and nothing more. If the indictment relates the elements of the agreement in sufficiently clear terms, defendants are informed of what they are required to meet. They need not be told what means or measures they had decided on to carry out their agreement, or that any act was done by any person in the execution of the agreement.

The modified rule of sufficiency of indictment is stated by the Circuit Court of Appeals of this circuit in Jelke v. United States, 255 Fed. 264, —— C. C. A. ——, October term, 1916, where the prosecution was under section 5440, requiring the pleading of an overt act. In that case it was alleged that defendants agreed that they would "cause" certain named persons to mix artificial coloring matter with oleomargarine to cause it to look like butter of a shade of yellow, and agreed among themselves to furnish and cause to be furnished to such named persons tub liners for packing the colored product, and paper wrappers for packing it, also to "cause" said persons to do other things definitely stated, all in order to escape taxation. How the defend-

ants had agreed to "cause" the persons named to do the things charged does not appear. The court held that a conspiracy to defraud the government out of the tax on oleomargarine is an offense, even though the details of how they would carry it out, and cause such persons to assist, may not have been agreed on, and that the law does. not require the defendant to be informed of all the details or means, which may not have been fully arranged.

The rule of the Jelke Case is thus stated by Judge Evans:

"An indictment is generally sufficient which charges a statutory crime substantially in the words of the statute, except in such cases where other precedents have been firmly established in analogous offenses at common law, or where such a charge would not fairly inform the accused of the nature of the charge."

This statement of the law rejects all·objections merely technical, so that it is necessary only to consider whether this indictment fairly informs the accused of the nature of the charge. In applying this rule the court in the Jelke Case approves decisions holding that section 5440, by requiring the pleading of an overt act, intended to relieve the pleader from the necessity of setting out the means agreed on by which the conspiracy was to be carried out. United States v. Dennee, Fed. Cas. No. 14,948; United States v. Goldman, Fed. Cas. No. 15,225. Bannon v. United States, 156 U. S. 468, 15 Sup. Ct. 469, 39 L. Ed. 494, is also cited as authority, in which it is said:

"At common law it was neither necessary to aver nor prove an overt act in furtherance of the conspiracy, and indictments therefor were of such general description that it was customary to require the prosecutor.to furnish the defendant with a particular of his charges. Rex v. Gill, 2 Barn. & Ald., 204; Rex v. Hamilton, 7 Car. & P. 448; U. S. v. Walsh, 5 Dill. 58, Fed. Cas. No. 16,636. But this general form of indictment has not met with the approval of the courts in this country, and in most of the states an overt act must be alleged. The statute in question changes the common law only in requiring an overt act to be alleged and proved."

People v. Arnold, 46 Mich. 268, 9 N. W. 406, is also approved, in which Judge Cooley'said:

"It is conceded that, if the act which the conspirators combine to perform is unlawful, it is not necessary to set out in the information the means intended to be employed in accomplishing it. * * * But if the end in view is lawful or indifferent, and the conspiracy only becomes criminal by reason of the unlawful means whereby it is to be accomplished, it becomes necessary to show the criminality by setting out the unlawful means."

The Court of Appeals also distinguished United States v. Cruikshank, 92 U. S. 542, 557, 23 L. Ed. 588, and Evans v. United States, 153 U. S. 584, 14 Sup. Ct. 934, 38 L. Ed. 830.

Since it is the agreement or conspiracy which is made unlawful by the Sherman Act, and no overt act is required to complete the offense, as is the case under section 5440 (United States v. Patten [C. C.] 187 Fed. 664, United States v. Cowell [D. C.] 243 Fed. 730), the question is only whether the agreement is sufficiently stated. The indictment purports to state the means by which the offense was to be carried out, but does not give all the particulars. The agency for the unions, the blackmailing, a further demand for money, and then

the strike are not stated. These, however are only the "means" of executing the offense. They may not have been considered at all by the defendants when they made their first, or even the last, demand on McLaughlin, deeming that the implied threat would be sufficient. Thus these things may not have constituted any part of the combination or agreement, only determined on at the last moment, when it was found that they could conceal their real purpose by using the dispute between the teaming company and the unions regarding wages, and use it for their own ends. It is the conspiracy which is denounced by the law, and that was complete when there was a meeting of minds to obstruct commerce. The commerce described in the indictment and found by the jury was interstate, and was directly restrained by the acts of defendants. Southern Pac. T. Co. v. I. C. C., 219 U. S. 498, 31 Sup. Ct. 279, 55 L. Ed. 310; Western Oil Refining Co. v. Lipscomb, 244 U. S. 346, 37 Sup. Ct. 623, 61 L. Ed. 1181; Western Union v. Foster, 247 U. S. 105, 38 Sup. Ct. 438, 62 L. Ed. 1006.

The motions in arrest of judgment should be overruled.