# UNITED MINE WORKERS OF AMERICA et al. v. CORONADO COAL CO. et al. *

(Circuit Court of Appeals, Eighth Circuit.  April 28, 1919.)

## No. 5154.

1. APPEAL AND ERROR ⚫1097(1)—REVIEW—SUBSEQUENT APPEALS—FORMER DECISION AS LAW OF CASE.

A question of law decided by an appellate court becomes the law of the case, and will not be reconsidered on a subsequent review.

2. COURTS ⚫343—JOINDER OF CAUSES OF ACTION—CONFORMITY STATUTE.

Where a state statute, as construed by its highest court, permits the joinder of plaintiffs or causes of action in an action at law, in the absence of federal legislation, such joinder may be made in a federal court in the state, under Conformity Act (Rev. St. § 914 [Comp. St. § 1537]).

3. ACTION ⚫50(3)—JOINDER OF CAUSES OF ACTION—ARKANSAS STATUTE.

Under the Arkansas Code of Practice, as construed by its Supreme Court, causes of action of different plaintiffs, arising out of the same torts, committed by the same persons, at the same time, and in pursuance of the same alleged conspiracy, may be joined in a single action.

4. APPEAL AND ERROR ⚫177—ESTOPPEL TO ALLEGE ERROR—FAILURE TO CLAIM RIGHTS AT TRIAL.

Where a number of causes of action against the same defendants are joined in an action, if defendants are thereby given additional rights, as a greater number of challenges to jurors, such a right must be claimed at the trial, to entitle them to insist upon it in the appellate court.

5. EVIDENCE ⚫368(1)—DOCUMENTARY EVIDENCE—COMPELLING PRODUCTION BY ADVERSE PARTY.

District Court has authority to require parties who are officers of an organization, as such officers, to produce books and records of the organization.

6. EVIDENCE ⚫373(2)—DOCUMENTARY EVIDENCE—AUTHENTICATION OF DOCUMENTS.

Records of a labor organization, containing printed reports of conferences between representatives of the organization and of employers, stenographically taken, and the correctness of which was testified to by officers of the organization and conferees, *held* sufficiently authenticated to be admissible in evidence.

7. CONSPIRACY ⚫19—ACTION FOR CONSPIRACY—EVIDENCE.

In an action by receivers of coal-mining companies against a miners' organization, its subsidiaries, and members to recover damages for destruction of property, alleged to have been pursuant to a conspiracy, records of the organization, containing reports of conferences with operators employing only union miners, in which the organization pledged itself to do all in its power to protect such operators from competition by non-union mines, *held* relevant.

8. CONSPIRACY ⚫19—ACTION FOR CONSPIRACY—EVIDENCE.

In an action for conspiracy, the law permits great latitude in the introduction of evidence tending to establish the conspiracy, and connecting those advising, encouraging, aiding, abetting, and ratifying the overt acts committed for the purpose of carrying into effect the objects of the conspiracy.

9. ASSOCIATIONS ⚫19—CORPORATIONS ⚫423—TORTS BY MEMBERS—LIABILITY—ENCOURAGEMENT OR RATIFICATION.

Corporations or associations are liable for the torts of their members or employés, if encouraged in the commission of them, or if ratified thereafter.

---

⚫For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
†Rehearing denied November 15, 1919.

10. CONSPIRACY ⊛⇒19—ACTION FOR CONSPIRACY—EVIDENCE.

In a civil action for conspiracy to destroy property, indictments of some of defendants for destruction of the property and pleas of guilty are admissible against them as admissions, and against their codefendants shown to have approved and ratified their unlawful acts.

11. CONSPIRACY ⊛⇒13—CIVIL LIABILITY—PERSONS LIABLE.

If unlawful acts were in pursuance of a conspiracy, and were committed before the conspiracy had been abandoned, or its object accomplished, all persons who were members of the conspiracy, or made themselves parties thereto at any time before it had been abandoned, or its object completed, are responsible.

12. CONSPIRACY ⊛⇒19—ACTION FOR CONSPIRACY—EVIDENCE.

Correspondence between an arms company and officers of a labor organization, showing a purchase by the latter of arms and ammunition and their shipment to local unions, by whose striking members they were used in a battle resulting in the destruction of plaintiff's mines, was admissible against the organization, in an action against it and its members for conspiracy.

13. CONSPIRACY ⊛⇒19—ACTION FOR CONSPIRACY—DAMAGES.

In an action for conspiracy to destroy plaintiff's mines, as a result of which and the unlawful acts of defendants pursuant thereto their leases were forfeited, evidence of the value of such leases was admissible on the question of damages.

14. DAMAGES ⊛⇒20—TORTS—NATURAL AND PROXIMATE CONSEQUENCES.

All damages which are the natural and proximate results of a tort are recoverable.

15. CONSPIRACY ⊛⇒21—ACTION FOR CONSPIRACY—SUFFICIENCY OF EVIDENCE—JURY QUESTION.

Evidence *held* sufficient to warrant submission to the jury of the question of conspiracy between the organization, United Mine Workers of America, and its subsidiary district and local unions and their members, to destroy plaintiffs' mine property, and to support a verdict finding such conspiracy, and that the destruction of the property was the result thereof.

16. APPEAL AND ERROR ⊛⇒263(1)—REVIEW—INSTRUCTIONS.

An appellate court can review only that part of a charge to which exception was taken at the trial.

17. TRIAL ⊛⇒193(1)—INSTRUCTIONS—OPINION OF JUDGE AS TO FACTS.

In the federal courts, the judge, in charging the jury, may, whenever he thinks it necessary to assist them in arriving at a just verdict, express his opinion upon the facts, where he also states that his opinion is not binding upon them, and that they are the exclusive judges of the facts.

18. APPEAL AND ERROR ⊛⇒1070(1)—HARMLESS ERROR—VERDICT.

Where there were a number of plaintiffs in an action of tort, claiming damages in a gross sum, it is not prejudicial error that the jury returned a general verdict for plaintiffs, without apportioning the damages between them.

19. DAMAGES ⊛⇒69—ACTIONS OF TORT—INTEREST.

In actions of tort the allowance of interest is discretionary with the jury, and the court may not allow interest where the jury has failed to do so.

Hook, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Western District of Arkansas; James D. Elliott, Judge.

Action by the Coronado Coal Company and others against the United Mine Workers of America and others. Judgment for plaintiffs,

and defendants bring error. Affirmed, conditional on remittitur by plaintiffs.

See, also, 235 Fed. 1, 148 C. C. A. 495.

This was an action by two receivers of nine corporations appointed by the court below in one proceeding in equity, in which these nine corporations were defendants. The basis of the action is to recover damages for the destruction of the property of these corporations in the possession of the receivers, they being engaged in mining, selling, and shipping coal from Sebastian county, Ark., 75 per cent. of which shipments were made to customers outside of the state of Arkansas, in the course of interstate trade and commerce. The complaint charges that the destruction of the property was by some of the defendants, and was committed in pursuance of a conspiracy and combination formed by all the defendants, in restraint of trade and commerce, among the several states, in violation of the Act of Congress of July 2, 1890, c. 647, 26 Stat. 209 (Comp. St. §§ 8820–8823, 8827–8830), the Sherman Anti-Trust Act, and amendments.

Among the defendants named are the United Mine Workers of America, District Union No. 21, and 28 local unions of the district union; the other defendants being officers of the head and district unions and members of the local unions. None of the unions are incorporated, but they are all voluntary associations of mine workers throughout the United States. The headquarters of the national organization of the defendant United Mine Workers of America are located in Indianapolis, in the state of Indiana. It is charged that the members of said association are subdivided into about 30 districts, and numerous local unions in each district. Each district union has jurisdiction of the local unions within its district, and the United Mine Workers over all. Other allegations as to the unions are set out in the opinion of this court in Dowd v. United Mine Workers of America, 235 Fed. 1, 2, 148 C. C. A. 495, when this case was before this court before, and it is therefore unnecessary to restate them. The present receivers are the successors of Dowd, who was the plaintiff when this action was instituted. There were three amended complaints filed, and later amendments to certain paragraphs of the last amended complaint.

After the demurrers to the third amended complaint, motion to quash service of process, and a motion to strike parts of the third amended complaint had been overruled, defendants filed their answers. They denied that the plaintiffs were engaged in interstate trade and commerce, and in effect denied all the material allegations of the complaint. Then they alleged that the United Mine Workers of America is a labor union composed of more than 400,000 working men in the United States, Canada, and Mexico, engaged in the digging of coal, organized in an unincorporated society; that it has no legal entity apart from its membership, is not engaged in business for profit, but has for its objects shorter working hours for its members, reasonable compensation for services rendered, and the betterment of general working conditions for its members, as shown by its constitution, a copy of which was filed; that no member or members, officer or officers, is authorized to act for, or in behalf of, or to represent, it beyond the scope, provisions, and terms of such constitution, and if any members of the organization committed the torts complained of, their acts were beyond the scope, provisions, and terms of the constitution, and therefore not binding upon the union.

There was a trial to a jury, and a verdict for the plaintiffs, on which judgment was entered for treble the amount of the verdict. Four days after the rendition of the verdict by the jury plaintiffs filed a motion to amend the judgment, by adding interest from the date of the destruction of the property to the date of entering the judgment, although the verdict made no allowance of interest. This motion was, by the court, several months later, sustained, and the judgment amended by adding treble the interest at the rate of 6 per cent.

Alton B. Parker, of New York City (Covington & Grant, of Ft. Smith, Ark., and Henry Warrum, of Indianapolis, Ind., on the brief), for plaintiffs in error.

Henry S. Drinker, Jr., of Philadelphia, Pa., and James B. McDonough, of Ft. Smith, Ark. (Roger B. Hull, of New York City, on the brief), for defendants in error.

Before SANBORN and HOOK, Circuit Judges, and TRIEBER, District Judge.

TRIEBER, District Judge (after stating the facts as above). The record is very voluminous, covering over 3,400 printed pages. There are 184 assignments of error, but counsel in their briefs and oral arguments only insisted upon those hereinafter mentioned, and we will therefore confine this opinion to those assignments and in the order presented by counsel.

[1] 1. The defendants insist that it was error to hold the unions which were made defendants as entities, against which an action could be instituted, process had, and judgment recovered; they being unincorporated labor unions.

This question was determined by this court on the former hearing, sub nomine Dowd v. United Mine Workers of America, 235 Fed. 1, 148 C. C. A. 495, and it was there held that under the Sherman Anti-Trust Act these unincorporated unions may be sued by one injured in his business or property by reason of anything done which is forbidden by the Sherman Act. That decision is the law of the case, and cannot now be again reviewed. In re Sanford Fork & Tool Co., 160 U. S. 247, 16 Sup. Ct. 291, 40 L. Ed. 414; National Bank of Commerce v. United States, 224 Fed. 679, 140 C. C. A. 219; Continental, etc., Bank v. North Platte Valley Irrigation District, 237 Fed. 188, 150 C. C. A. 334; Griggs v. Nadeau, 250 Fed. 781, 163 C. C. A. 113.

[2, 3] 2. It is next claimed that there was a misjoinder of plaintiffs and of their causes of action, and that the demurrer to the complaint on that ground should have been sustained.

In order to understand the issues involved in this motion, it is proper to state that the complaint alleges that the nine corporations, for which the plaintiffs as receivers sued, were under the control of the same persons, who owned all the shares of stock of all nine corporations and all were operated as one, eight of them being subsidiaries of the Bache-Denman Coal Company; that by reason of these facts, the destruction by the defendants of the property of said corporations, they sustained the losses jointly; that by reason of the unlawful acts of the defendants the plaintiffs were prevented from operating any of the mines, they being in close proximity in the Prairie Creek valley, in Sebastian county, Ark. It is further alleged that the receivers were appointed by the District Court by a single decree, in one action.

That under the Code of Practice of the state of Arkansas, in which state the wrongs were committed and this cause tried, it was proper to join all the plaintiffs' causes of action, all of them arising out of the same torts, committed by the same persons, at the same time, and in pursuance of the same alleged conspiracy, has been determined by the Supreme Court of the state ever since the enactment of Act May

11, 1905 (Laws Ark. 1905, p. 798).   St. Louis, I. M. & S. Ry. Co. v. Broomfield, 83 Ark. 288, 104 S. W. 133; Southern Anthracite Coal Co. v. Bowen, 93 Ark. 140, 124 S. W. 1048; Hargis v. Lawrence, 136 Ark. 323, 204 S. W. 755.   Under the Conformity Act of Congress (section 914, Rev. Stat. [Comp. St. § 1537]) the state practice controls proceedings at law in the national courts held in the state, in the absence of an act of Congress.   Glenn v. Sumner, 132 U. S. 152, 156, 10 Sup. Ct. 41, 33 L. Ed. 301; Sawin v. Kenny, 93 U. S. 289, 23 L. Ed. 926; O'Connell v. Reed, 56 Fed. 531, 536, 5 C. C. A. 586; Rush v. Newman, 58 Fed. 158, 161, 7 C. C. A. 136.

In Kansas City Southern Ry. Co. v. Leslie, 238 U. S. 599, 603, 35 Sup. Ct. 844, 59 L. Ed. 1478, an action arising under the national Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [Comp. St. §§ 8657–8665]), the plaintiff joined two distinct and separate actions caused by the same act of negligence, one to recover damages for the benefit of the estate of the deceased, and the other for the pecuniary loss of the next of kin.   There was a verdict in favor of the plaintiff for a lump sum on both causes of action, without any apportionment to the different beneficiaries.   This was made one of the assignments of error.   Notwithstanding that in Gulf, Colorado, etc., Ry. v. McGinnis, 228 U. S. 173, 33 Sup. Ct. 426, 57 L. Ed. 785, it had been held that "Though the judgment may be for a gross amount, the interest of each beneficiary must be measured by his or her individual pecuniary loss.   That apportionment is for the jury to return"—the judgment entered on the verdict of the jury without apportionment was upheld, the court holding:

"As the challenged verdict seems in harmony with local practice and has been approved by the court below [referring to the Supreme Court of Arkansas], the judgment thereon is not open to attack here upon the ground specified."

[4] But it is contended that there is an act of Congress regulating the consolidation of causes (section 921, Rev. Stat. [Comp. St. § 1547]), and that in Mutual Life Insurance Co. v. Hillmon, 145 U. S. 285, 12 Sup. Ct. 909, 36 L. Ed. 706, this has been construed adversely to the ruling of the court below.   We do not so construe the opinion of the court.   What the court decided was that—

"Where the English consolidation rule has not been adopted, the American courts, state and federal, have exercised the authority of ordering several actions by one plaintiff against different defendants to be tried together, whenever the defense is the same and unnecessary delay and expense will be thereby avoided."

The court then proceeded:

"But although the defendants might lawfully be compelled, at the discretion of the court, to try the cases together, the causes of action remain distinct, and required separate verdicts and judgments; and no defendant could be deprived, without its consent, of any right material to its defense, whether by way of challenge of jurors, or of objection to evidence, to which it would have been entitled if the cases had been tried separately."

In the instant case there was no consolidation of actions, but assuming, without deciding, that the same rule applies to actions orig-

inally brought by several plaintiffs, or against several defendants, which could properly be consolidated under that section, objection can only be made if the parties are deprived of a right material to their defense, "whether by way of challenge of juror or of objection to evidence to which it would have been entitled if the causes had been tried separately." Of course, such rights can only be claimed at the trial of the cause, and not by demurrer to the complaint. There is no claim that the defendants were deprived of either of these rights at the trial. To entitle the defendants to insist in the appellate court that they were entitled to more than three peremptory challenges of jurors, that right must be claimed at the trial, and also that the parties complaining had exhausted their right of peremptory challenges. It was so held in Connecticut Mutual Life Insurance Co. v. Hillmon, 188 U. S. 208, 212, 23 Sup. Ct. 294, 47 L. Ed. 446, when the case, reported in 145 U. S. 285, 12 Sup Ct. 909, 36 L. Ed. 706, was for the second time before the Supreme Court. The record here shows that the defendants only challenged one juror peremptorily. It fails to show that they had made any claim to more than three challenges. How, then, can it be claimed that the court erred, when it was never called on to rule on the question, when the jury was selected, and the defendants were not prejudiced by having exhausted the three challenges?

[5] 3. It is claimed that the court erred in requiring the defendants to produce certain books, writings, and documents.

If the petitions for the books and documents had failed to specify what books and documents were wanted, or did not make a sufficient showing of their materiality, so that the object was merely an attempt to obtain information, it would have been error to grant the petitions. United States v. Terminal Railway Association (C. C.) 154 Fed. 268, 272, and authorities cited. But each of the petitions set out and described the documents wanted, and the reasons for their materiality. All except the first petition were against the defendants as officers of the organization, to produce books and documents in their possession as such officials, which it was alleged were records of their organization. The first petition included them as officers and individuals, but this petition was denied. Section 262, Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1162), which is a re-enactment of section 716, Rev. Stat. (Comp. St. § 1239), authorizes such an order. It was so held in American Lithographic Co. v. Werckmeister, 221 U. S. 603, 609, 31 Sup. Ct. 676, 55 L. Ed. 873. As the orders to produce them were limited to the parties as officials of the United Mine Workers of America, and not as individuals, the claim that the orders were in violation of the Fourth and Fifth Amendments to the Constitution must also fail. Hale v. Henkel, 201 U. S. 43, 69, 26 Sup. Ct. 370, 50 L. Ed. 652; Wilson v. United States, 221 U. S. 361, 31 Sup. Ct. 538, 55 L. Ed. 771, Ann. Cas. 1912D, 558; Wheeler v. United States, 226 U. S. 478, 33 Sup. Ct. 158, 57 L. Ed. 309.

[6] 4. Did the court err in allowing the defendants in error to read in evidence extracts from the printed records of the joint conference proceedings, conferences between a large number of coal mine

operators, employing only union labor, and the officials of the United Mine Workers of America?

To determine this assignment of error it is necessary to refer to the allegations of the complaint. The complaint, except for some amendments, which are not of sufficient materiality to this issue to require that they be set forth, will be found in a note to the former opinion of this court in 235 Fed. 9, 148 C. C. A. 495.

The last amendment to paragraph 21 gives the names of 231 operators, who had entered into an agreement with the United Mine Workers of America to employ only union miners and conform to the rules of the unions. These were furnished by the plaintiffs in pursuance of an order of the court, made on motion of the defendants. That motion, among other requests, asked that plaintiffs "state the names of the persons acting or assuming to act for the operators, referred to in said paragraph and amendments thereto." The main objection to the introduction in evidence of these records was "that no proper foundation for their introduction had been laid." The testimony shows that the proceedings of these conferences were taken down stenographically, copies furnished to the United Mine Workers of America, and by it caused to be printed and kept in its archives under the control of its secretary. Before they were introduced in evidence, Mr. Green, the secretary of the United Mine Workers' organization, testified that the printed reports were "verbatim reports of the arguments, discussions, and propositions of what took place at these conferences, and that the association caused them to be printed, and the printed volumes produced were the ones that came back from the printer." A number of representatives of the operators, and several high officials of the United Mine Workers of America, also testified orally to what took place at these meetings, and all agreed with Mr. Green, the secretary, that these printed records were correct transcripts of the proceedings of the conferences. As the testimony of the officials of the miners' organization, as well as of the operators, who attended these conferences, verified the correctness of the printed records introduced, how can it be claimed that there was no foundation for the admission in evidence of these records? St. Louis & San Francisco R. R. v. Duke, 192 Fed. 306, 309, 112 C. C. A. 564; Portland Gold Mining Co. v. Flaherty, 111 Fed. 312, 49 C. C. A. 361; Wilhite v. Houston, 200 Fed. 390, 393, 118 C. C. A. 542. The objection to their introduction for want of a proper foundation is without merit.

[7] 5. Were they irrelevant?

The records establish that these conferences between the United Mine Workers and coal operators, who employed only union labor, were held for the purpose of protecting these operators against competition from nonunion or independent operators, who were able to produce coal cheaper, owing to the fact that they had the 10-hour workday, while in the mines operated by union labor the 8-hour workday was in force; that the independent operators were not subject to the strict regulations prescribed by the Mine Workers' union, nor did they pay as high wages to the miners. To protect these op-

erators, the records show, the United Mine Workers obligated themselves "to afford all possible protection to the trade and to the other parties hereto against any unfair competition, resulting from the failure to maintain scale rates." In order to accomplish this the organization pledged itself to attempt to "unionize" all coal mines, and thus, as stated by Mr. Lewis, its vice president—

"wipe out competition between us as miners—first, viewing it from our side of the question; next, for the purpose of wiping out competition as between the operators in these four states. When we have succeeded in that, and we have perfected an organization on both sides of the question, then, if I understand the real purpose of this movement, it is that we will jointly declare war on every man outside of this competitive field who will do anything in any way endangering the peace that exists between us. What is necessary to do this? Organize our forces in the competing fields, so far as the United Mine Workers are concerned. Go into these outside competing fields and tell your competitors that they have to join this movement, whether they like it or not, and give stability to the coal business of the United States."

In the 1902 joint conference, Mr. Robbins, speaking for the operators, complained of defendants, saying:

"Four years ago, in the city of Chicago, we agreed to be the advance guard on the question of an 8-hour day, with the distinct and absolute promise that unless our competitors were brought up to the same conditions that we would be put back where we were. And what is the result? None of our competitors have been brought up. In no place that we compete, that I know of, has the 8-hour day been established. We are competing constantly with operators that still have a 10-hour day. Their cost is proportionately less."

When the miners' convention met that year, the following resolution was adopted in order to carry out the pledges made to the operators:

Resolution 33: "Whereas, the miners of Virginia and Kentucky in the past have been a detriment to the organization in other states by their not being organized: therefore be it resolved, that our national organization shall use its power in all forms to bring these miners into the organization."

In the convention of the Mine Workers in 1904 the following resolution, introduced by a representative of a local union from district 21 (Arkansas, Oklahoma, and Texas) was adopted:

"Resolved, that in strict compliance with our obligations and teaching, we accord a hearty approval to our national board on its action in regard to district No. 15 strike, now on, in Colorado, and whatever action taken by the national that in their judgment is necessary to the successful ending, in the elevation of the craft in district No. 15, meets our entire approval, for which we pledge our unqualified support, as our knowledge of the field of Southern Colorado, in the event of an unsuccessful issue of the trouble now pending, would work almost unsurmountable and incalculable damage to district No. 21, as it would be an unjust competitor in the same commercial field, and could with very little effort undersell and supersede us in the Oklahoma and Southwestern Kansas markets."

Without setting out in full all the agreements between the miners and the union operators, and the resolutions of the miners at their conventions, for the purpose of carrying out these agreements, it clearly appears from these records that the United Mine Workers were pledged and determined to unionize all coal mines in the nonunion districts, for the purpose of protecting the operators in the district in which the mines had been unionized, in competitive mar-

kets in other states, and in order to appease these operators, who complained at every joint conference that they were unable to comply with their agreements with the organization and compete with the independent operators, unless they are unionized. The objection is without merit.

[8] 6. The objection to the introduction of the United Mine Workers' Journal is equally untenable. The secretary of the organization, testified that—

"It is the official publication of the organization, published by authority and under the supervision of the International Executive Board of the United Mine Workers of America; that its editor is appointed by the president of the International Union."

Therefore the editorials, which were published in almost every issue of the Journal, must be deemed the acts of the organization. They were clearly admissible. As the action is one for conspiracy, the law permits great latitude in the introduction of evidence tending to establish the conspiracy and connecting those advising, encouraging, aiding, abetting, and ratifying the overt acts committed for the purpose of carrying into effect the objects of the conspiracy.

The main issue in this cause, so far as the national organization and its officers were concerned, was whether the torts committed by some of the defendants were in pursuance of an unlawful conspiracy to compel the plaintiffs and other coal mine operators to unionize their mines, and were authorized, encouraged, advised, and, if not authorized, ratified by the national organization and its officers, after they had been committed. The court did not err in admitting these journals in evidence. Clune v. United States, 159 U. S. 590, 593, 16 Sup. Ct. 125, 40 L. Ed. 269; Hitchman Coal Co. v. Mitchell, 245 U. S. 229, 249, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461; Louie v. United States, 218 Fed. 36, 41, 134 C. C. A. A. 58.

[9] That corporations, and this association must be treated as such in this action, are liable for the torts of their members or employés, when encouraged in the commission of them, or if ratified thereafter, is well settled. Philadelphia, etc., R. R. v. Quigley, 62 U. S. (21 How.) 202, 16 L. Ed. 73; Denver, etc., Ry. v. Harris, 122 U. S. 597, 7 Sup. Ct. 1286, 30 L. Ed. 1146; Stewart v. Wright, 147 Fed. 321, 327, 77 C. C. A. 499. Nor does the doctrine of ultra vires apply. National Bank v. Graham, 100 U. S. 699, 25 L. Ed. 750; Chesapeake & Ohio Ry. v. Howard, 178 U. S. 153, 160, 20 Sup. Ct. 880, 44 L. Ed. 1015.

[10] 7. The admission in evidence of the indictment and pleas of guilty of some of the defendants, members of the local unions, for the destruction of this property, was clearly proper against those defendants, as admissions made by them, and if their unlawful acts were applauded and approved by their codefendants, after having encouraged them in their unlawful acts, such approval is a ratification of these unlawful acts, and makes them liable. Loewe v. Lawler, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815; Allis Chalmers Co. v. Reliable Lodge (C. C.) 111 Fed. 267; Kroger Grocery & B. Co. v. Retail Clerks' I. & P. Ass'n (D. C.) 250 Fed. 890, 897; Alaska Steamship Co. v. International, etc., Association (D. C.) 236 Fed. 964.

[11] Whether the acts of those defendants amounted to a ratification was a question to be determined by the jury from the evidence, under proper instructions. If the unlawful acts were in pursuance of a conspiracy, and were committed before the unlawful conspiracy had been abandoned, or the object of the conspiracy completed, all persons who were members of the conspiracy or made themselves parties thereto at any time before the conspiracy had been abandoned, or its object completed, are responsible. Thomas v. United States, 156 Fed. 897, 910, 84 C. C. A. 477, 17 L. R. A. (N. S.) 720; Smith v. United States, 157 Fed. 721, 728, 85 C. C. A. 353; United States v. Babcock, 3 Dill. 581, 585, Fed. Cas. No. 14487; Goldfield Consolidated Mines Co. v. Goldfield Miners Union (C. C.) 159 Fed. 524. In Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 243, 38 Sup. Ct. 65, 70 (62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461), Mr. Justice Pitney, speaking for the court in relation to the acts of the head organization, its resolutions, contributions of money to the striking union men, the encouragement and approval of the destruction of property, said:

"The plain effect of this action was to approve a policy which, as applied to the concrete case, meant that, in order to relieve the union miners of Ohio, Indiana, and Illinois from the competition of the cheaper product of the non-union mines of West Virginia, the West Virginia mines should be 'organized' by means of strikes local to West Virginia, the strike benefits to be paid by assessments upon the union miners in the other states mentioned, while they remained at work."

8. What has been said heretofore as to the admissibility of the records of the joint conferences applies also to the records of the meetings of the Executive Board of the United Mine Workers of America.

[12] 9. The correspondence between the officials of the Remington Arms Company, showing the purchase of arms and ammunition and payment therefor, by the officers of the United Mine Workers of America, their shipment to Hartford, Ark., to the officers of the district and local unions, their distribution by them to the striking members, shortly before the battle which resulted finally in the destruction of plaintiffs' mines, and their use by them, was admissible as tending to show that the organization aided and encouraged the commission of the torts. But in no event could the admission be prejudicial to the defendants, for there was ample testimony showing that those who committed these wrongs were members of the union, armed with guns and ammunition, which were freely used on the occasions alleged in the complaint.

[13, 14] 10. Evidence of the value of the leases held by plaintiffs, and which, by reason of the unlawful acts of the defendants, are shown to have been forfeited, was clearly a part of the damage sustained, and admissible for the purpose of enabling the jury to determine the losses and damages of the plaintiffs. Section 7 of the Sherman Act (Comp. St. § 8829) provides for threefold damages sustained by reasons of violations of the provisions of that act. A lease may be as valuable as any other species of property, and they are sold and transferred for valuable considerations in the same manner as any other

species of property. It is almost an everyday occurrence that oil, coal, and other mining leases are sold for large sums of money. The court in its charge to the jury submitted that question fairly, and no exceptions were taken to that part of the charge. All damages which are the natural and proximate results of a tort are recoverable. United States v. Behan, 110 U. S. 338, 4 Sup. Ct. 81, 28 L. Ed. 168; Howard v. Manufacturing Co., 139 U. S. 199, 206, 11 Sup. Ct. 500, 35 L. Ed. 147; Farmers' Loan & Trust Co. v. Eaton, 114 Fed. 14, 17, 51 C. C. A. 640; City of Ironton v. Harrison Construction Co., 212 Fed. 353, 129 C. C. A. 29.

[15] 11. Did the court err in refusing to direct a verdict for the defendant, the United Mine Workers of America?

It is contended that the evidence fails to establish a conspiracy in violation of the Sherman Act, which is the gist of the action, and therefore it is claimed there can be no recovery in this action. A great deal of the testimony, relating to the organization of the Mine Workers, their acts to accomplish the object of absolute control of all coal mines, is almost identical with that set out in the opinion of the District Judge in Hitchman Coal & Coke Co. v. Mitchell, 202 Fed. 512, to which reference is made, in order to shorten this opinion.

The evidence, to our minds, as it was in the opinion of the learned trial judge and the jury, established the conspiracy practically beyond question. It is much stronger than that in the Hitchman Coal & Coke Co. Case. To review it fully, covering as it does over 3,000 pages of the printed record, would only tend to prolong this opinion, and serve no useful purpose. The law requires that, in order to entitle defendants to such a direction, the court must give the evidence the strongest probative effect, and view it in the light most favorable to the plaintiffs, and, if there is any substantial evidence to sustain the allegations in the complaint, a peremptory instruction must be refused. This is too well settled to require the citation of authorities. A careful reading of the evidence satisfies that it fully sustains the conclusions of the learned trial judge on these motions. There was substantial evidence to warrant a finding of the following facts:

That there was concerted action on the part of the union miners of district No. 21, with the union miners of the entire national organization and the heads of that organization, tending to demonstrate the idea and motive entertained by the entire organization, and all the members of it, that it was necessary, in order to protect the union workers in the fields already unionized, to unionize the nonunion fields, as well as to hold all those which were already unionized.

To attain the objects of the United Mine Workers, to control the mining of coal in the United States, it was deemed to be necessary that they may be in a position to enforce their demands absolutely, secure the unionization of all fields, prevent the production of nonunion mined coal, and destroy the competition of nonunion-mined coal in the markets of the country with union-mined coal.

That the national organization is composed of all of the individual members of the local unions, and by its constitution it is divided into branches, district and local, all subordinate to the national organiza-

tion. The construction and enforcement of the constitution is placed in the officers of the national organization; the district and local organizations are directly subject to the direction and control of the International Executive Board.

That while the constitution gives to the district organization the power and authority to authorize strikes under certain conditions, it does not delegate exclusive authority to these district officers. They may order a local strike, but in view of other provisions in the constitution and in the light of the record of the doings of the Executive Board of the national organization, in exercising absolute control over the different districts, this provision seems to be only permissive, and was never intended to take the absolute control from the International Executive Board. The national board, after the local strike was ordered, had the right to supervise and absolutely control the same, and had the right to discipline to the extent of absolutely taking the charter away from the offending members in the event the orders of such national board were not complied with.

Article XII, section 2, of the constitution of the national organization, provides:

"Before final action is taken by the district upon questions that * * * may require a strike, * * * the president and secretary of the aggrieved district shall jointly prepare, sign, and forward to the national president a statement setting forth the grievance complained of, the action contemplated by the district, together with the reasons therefor, and await the decision of the national president and be governed thereby."

The national organization has, undoubtedly, under the constitution, supreme authority. The judgment, discretion, wisdom, and power of the entire organization are vested in the national organization; every member of a local union is a member of the national organization and a contributor to its funds.

That prior to April 6, 1914, when mob violence was first resorted to against plaintiffs' mines, communications were had, by telegrams, between officers of the district and members of the local organizations, that employés of the plaintiffs were on that day and until the final destruction of the property, beaten into insensibility, and that it was all done in the name, at least, of the United Mine Workers of America.

There was evidence that the national officers and officers of the district organization knew what was being done from April 6, 1914, to the day of the destruction of the plaintiffs' property on July 17, 1914, and that no effort was made to stop these unlawful acts of violence by the national organization.

It is established beyond question that the property of the plaintiffs was burned and their mines destroyed in the course of the strike, for the purpose of carrying out the aims, objects, and purposes of the national organization, and its objects were thereby attained to the extent of the elimination of the nonunion mines of these plaintiffs by the destruction of their property, and thereby kept nonunion coal, produced and intended to be produced from these mines, out of interstate commerce. There was not a word of criticism by the United Mine Workers of America—no suggestion of discipline; on the oth-

er hand, strike benefits were paid, pensions allowed, court costs assumed, and every act committed by these members of the district and local organizations approved by the entire organization.

As to the motion of the other defendants for a directed verdict, there was also substantial evidence tending to establish that on Saturday, April 4th, when plaintiffs' mines were opened as "nonunion" or "open shop" mines, a number of the union miners congregated at the mines, some of them attempting to get inside the inclosure. On the next day, Sunday, some minor disturbances occurred, throwing of rocks toward the houses where the nonunion employés lived, and calling them opprobrious names. A few days before the opening of the mines, with nonunion employés, Mr. Reed, a member of the union, approached Mr. Argo, a bookkeeper of the plaintiffs', and asked him if the company was going to run an open shop. He then stated "that if they did they would not last longer than Pat stayed in the army." On that Sunday a meeting of the union miners was held at Hartford, and storekeepers there were told to close their stores the next day and go to Prairie Creek for the demonstration to be held there to prevent the opening of the mines with nonunion labor.

On Monday, April 6th, large crowds of union miners and sympathizers met in front of the union hall of the Prairie Creek local union, about a quarter of a mile from the office of the Prairie Creek mine No. 4, where speeches were made by some of the miners, and a committee appointed, which called on the mine superintendent and asked that the company abandon its attempt to run it as nonunion, one of the committee telling him, "if they didn't want a repetition of Colorado." Meanwhile the crowd, which had accompanied the committee, had broken over the ropes of the inclosure and assaulted two of the guards so seriously that they had to be taken to the hospital at Ft. Smith.

To prevent further trouble the mine was closed, and thereupon the miners hoisted an American flag, and alongside of it a banner bearing the words: "This is a union man's country." The nonunion miners were afraid to come out of the mine. Some of the union men then went in, pulled the fires, and assaulted and injured a number of the men. A physician, a sympathizer with the union miners, was with the strikers, but refused to treat the serious wounds inflicted on one of the nonunion men. On the next day the bookkeeper was visited at his home and warned that unless he and his wife left they would be killed. Two weeks later he was assaulted and beaten by the financial secretary of the local union.

A temporary injunction against the strikers was obtained, but in spite of that the employés of the plaintiffs were threatened and at various times assaulted. In May the temporary injunction was made permanent by the court. In that month the convention of district No. 21 was held at Ft. Smith, which was attended by the district officers, and also the defendant John P. White, president of the United Mine Workers of America. A few days later Dan Wilcox, president of the local union, at Adamson, Okl., told J. A. Murry that the miners of Oklahoma "were going to come down to Prairie Creek and clean those scabs out." The latter part of June the secretary-treasurer

of district 21 purchased rifles from the Remington Arms Company, and from dealers at Hartford and Ft. Smith, 27 high-powered auto-loading rifles, 28 old Springfield rifles, and several thousand cartridges for the same, which were paid for by checks of the union. These arms and ammunition were shipped to members of the local union. Some of them afterwards pleaded guilty to that charge and were sentenced to imprisonment. Two nonunion miners, Baskins and Sylsberry, were murdered, while in the custody of a constable. Mr. Stewart, president of district No. 21, told a deputy marshal, in talking about the injunction:

"Damn the injunction! The national government is against us, but the people are with us, and we are going to win."

Some of those working in the mines were told by members of the union, a few days before July 17th, that they had better stay out, as there was going to be trouble. Others of the employés were also warned to the same effect. Residents of Frogtown, about half a mile from the Prairie Creek mines, where many of the union miners lived, were warned by them to leave the village on July 17th, as there would be trouble, and a large number of them left. On that day meetings of the miners were held at Hartford and at Bolen Pond. The union miners, employed in the union mines in the vicinity, did not report for work on that day. About midnight of the night of the 16th, all the lights at the mine went out, and about 4 o'clock a. m. a number of men fired shots into the company's property. At 7 o'clock a. m. they surrounded the mining camp, took possession of No. 3 tipple, and blew it up with dynamite. There was a regular battle then fought between the company's employés and the union men. They then set fire to several houses, burned some loaded cars, and destroyed the property, as alleged in the complaint. In October another attempt was made to open the mines under the protection of the court, and they were again attacked and the workmen driven off.

The learned counsel for defendants neither in their voluminous brief (326 printed pages) nor in their oral argument questioned these statements of facts, nor did they seriously attack the sufficiency of the evidence, but they insist that they do not establish that the plaintiffs were engaged in interstate commerce, and therefore these acts were not in violation of the Sherman Act. The leading case relied on is United States v. Knight, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, but this case, if not expressly overruled, has been much weakened by the later decisions of the Supreme Court, and it was so held by this court when the case was here before. 235 Fed. 1, 8, 148 C. C. A. 495. As this court, when this case was here before, held that the alleged wrongs and torts of the defendants charged in the complaint, and which at the trial were established by substantial evidence, constituted an interference with interstate commerce, and violated the Sherman Act, that opinion is the law of the case, and cannot again be re-examined.

12. It is also contended that, while the constitution of the union authorizes strikes, it does not authorize unlawful acts, such as the destruction of property, and that strikes are not unlawful. The trial

court did not hold that strikes were unlawful, but, on the contrary, held, "The right of the union miners to strike cannot be questioned," but added, "as long as no violence was used."

There were only two exceptions taken to the charge of the court. These were:

(1) "The defendants separately except to the instruction which submits to the jury the question that the United Mine Workers of America, in its entire membership, can be held responsible for the conduct of a local strike when violence is used without showing that the entire membership participated in the wrongful acts, and without full knowledge of the same ratified such wrongful conduct before the institution of this suit."

(2) "And the defendants severally except to that part of the court's charge which submits to the jury the question that the controversy between the miners and the plaintiffs in question was under the control of the International Association and its officers, and that they were charged with the duty of preventing violence and with the responsibility of any violence that occurred or any wrongful acts that were committed."

The first exception was not, and could not well be, insisted on. It is unnecessary that each and every member of an organization engaged in an unlawful conspiracy must participate in the wrongful acts committed by some of the conspirators. The act of one, in carrying out the objects of the conspiracy, is the act of all the conspirators.

The second exception has no basis whatever to rest on, as nothing in the charge of the court was to that effect.

13. The next contention is that the court erred in refusing to give the special requests for instructions asked in behalf of the defendants.

Counsel in their brief include under one head a number of assignments, 150 to 176, inclusive. They are instructions which requested directed verdicts in favor of each of the defendants. We have hereinbefore held that the court did not err in refusing to direct a verdict for any of the defendants. It is therefore unnecessary to repeat what has been said.

[15] 14. Assignment No. 177 relates to the court's additional charge, when the jury returned for further instructions and the charge given by the court when the jury was recalled, after having failed to agree on a verdict for two days.

As to the first additional charge, when the jury came into court for additional instructions, it is sufficient to state that no exception was taken to any part of that additional charge.

When the jury was recalled by the court on the second day, the court expressed its opinion as to the evidence, and said, in effect, that in its opinion the plaintiffs had made out a case entitling them to a verdict, but added:

"Now, that is the judgment of this court, and if it were my duty to decide it, I would decide it here. Now, you are not bound by my opinion. I have a right to give you my judgment; however, you are the sole and exclusive judges of the facts, and it is for you to determine these issues of fact independent of my judgment, and this court believes you ought to determine it, and under your oaths as jurors and agree upon a verdict."

The only exception taken by defendants to that charge was:

"Mr. Grant: May I take an exception to that part of the charge with reference to the great conspiracy, and also that part which is to the effect that the organization put that in force?

"The Court: Yes, sir; in the opinion of the court you are entitled to your exception.

"Mr. Grant: I just desire to get an exception.

"The Court: The exception is allowed."

Counsel now, not only ask that that part of the charge which was excepted to be reviewed, but ask us to review the entire supplemental charge, because they say: First, that it amounted "to a peremptory instruction to return a verdict against the defendants," and, second, that "the opinion regarding the facts of the case, which the court formed and expressed to the jury, was an erroneous one."

As to the first contention, the Supreme Court, in Allis v. United States, 155 U. S. 117, 122, 15 Sup. Ct. 36, 38 (39 L. Ed. 91), said:

"There is no intimation in the exception that the defendant at the time thought that the court was trying to coerce the jury, or suggested that its language might have such an influence upon them. Evidently the claim of coercion is an afterthought, from subsequent study of the record. But it is settled that no such afterthought justifies a reviewing court in reversing a judgment."

This was in a criminal case, in which the defendant had been convicted of an infamous crime.

In Robinson & Co. v. Belt, 187 U. S. 41, 50, 23 Sup. Ct. 16, 19 (47 L. Ed. 65), it was held:

"While it is the duty of this court to review the action of subordinate courts, justice to those courts requires that their alleged errors should be called directly to their attention, and that their action should not be reversed upon questions which the astuteness of counsel in this court has evolved from the record."

The same rule has been followed by this court in many cases. Lesser Cotton Co. v. St. L., I. M. & S. Ry., 114 Fed. 133, 52 C. C. A. 95; Beiseker v. Moore, 174 Fed. 368, 373, 98 C. C. A. 272; Maynard v. Reynolds, 251 Fed. 784, 786, 164 C. C. A. 18.

[17] But even if there had been an exception sufficient to present that issue in this court, the charge did not pass beyond the limits of the rule of the national courts relative to the statement to the jury of the court's opinion upon the deductions from the evidence relative to the facts in issue. In Vicksburg & Meridian R. R. v. Putnam, 118 U. S. 545, 553, 7 Sup. Ct. 1, 2 (30 L. Ed. 257), that rule is thus stated:

"In the courts of the United States, as in those of England, from which our practice is derived, the judge, in submitting the case to the jury, may at his discretion, whenever he thinks it necessary to assist them in arriving at a just conclusion, comment upon the evidence, and call their attention to the parts of it which he thinks important, and express his opinion upon the facts; and the expression of such an opinion, when no rule of law is incorrectly stated, and all matters of fact are ultimately submitted to the determination of the jury, cannot be reviewed on writ of error."

Other cases to the same effect are United States v. Reading R. R., 123 U. S. 113, 114, 8 Sup. Ct. 77, 31 L. Ed. 138; Doyle v. Union

Pacific Ry., 147 U. S. 413, 430, 13 Sup. Ct. 333, 37 L. Ed. 223; Simmons v. United States, 142 U. S. 148, 155, 12 Sup. Ct. 171, 35 L. Ed. 968.; Capital Traction Co. v. Hof, 174 U. S. 1, 19 Sup. Ct. 580, 43 L. Ed. 873; Freese v. Kemplay, 118 Fed. 428, 430, 55 C. C. A. 258: Smith v. St. Louis, I. M. & S. R. R., 214 Fed. 737, 742, 131 C. C. A. 43; Griggs v. Nadeau, 250 Fed. 781, 163 C. C. A. 113.

The court in its general charge said:

"In trials of this character, like all civil actions, the exclusive province of the jury is to pass upon the facts, and determine the issues of fact that are presented by the pleadings."

In the supplemental charge, of which the defendants now complain, the court told the jury:

"Now, you are not bound by my opinion. I have a right to give you my judgment; however, you are the sole and exclusive judges of the facts, and it is for you to determine these issues of fact independent of my judgment."

In our opinion this charge clearly and forcibly submitted every material fact which had arisen during the trial, and neither peremptorily nor otherwise coerced or directed a verdict in favor of either party. Suslak v. United States, 213 Fed. 913, 919, 130 C. C. A. 391.

Turning to the only question covered by the exceptions, to wit, the opinion which the court expressed to the jury in the supplemental charge, with reference to the great conspiracy, and also that part which is to the effect that the organization put that in force, is also untenable. First, there was no error in the court's charge upon the subject, because he merely expressed his opinion on the evidence, the facts and the effect of the evidence, and he told the jury that his opinion was not binding upon them; so it necessarily follows that, even if it was a mistaken opinion, it was not error, under the rule of practice in the national courts, to express his opinion of the evidence. As stated hereinbefore, there is a vast volume of substantial evidence tending to sustain his views.

[18] 13. Assignments 178 and 179 are to the effect that the court erred in accepting the verdict in the form returned by the jury, to wit:

"We, the jury find the issues in favor of the plaintiffs and against the defendants, and assess plaintiffs' actual damages at $200,000.00"

—and not requiring the jury to find the separate damages sustained by the several plaintiffs. The exception taken to the verdict was:

"Mr. Grant: I would like to except to the form of the verdict, for the reason that, as we understand it, the verdict of the jury should apportion the damages."

The exception does not specify whether counsel wanted the damages apportioned among the plaintiffs or the defendants. If it was intended to have the apportionment between the defendants, it was clearly without merit. Washington Gaslight Co. v. Lansden, 172 U. S. 534, 552, 19 Sup. Ct. 296, 303 (43 L. Ed. 543), where it was held that—

"Those of the wrongdoers who are sued together and found guilty in an action of tort are liable for the whole injury to plaintiff, without examining

the question of the different degrees of culpability. And if but one is sued, he is liable for all the damages inflicted by the most culpable."

If it was intended to have the apportionment of the damages awarded to the plaintiffs, the request should have been made to that effect, in order that the court may have its attention called thereto. But, assuming that the exception was intended to have the apportionment of the damages to each of the corporations represented by the receivers, without requesting it in plain language, the exception cannot be sustained. There is no complaint that the verdict is excessive; therefore, it may well be asked, how are the defendants prejudiced? As stated in Kansas City Southern Ry. v. Leslie, 112 Ark. 305, 332, 167 S. W. 83, 93 (Ann. Cas. 1915B, 834):

"Appellant, at the time the verdict was rendered, made no objection to its form. He did not ask that the jury be required to return separate amounts for pain, and suffering, and for loss of contributions. The widow and child, under the law, were entitled to the entire amount. They were the only persons having a pecuniary interest in the amount of damages recovered, and it could not prejudice appellant because these damages were returned in a lump sum. Appellant will be protected in the payment of the judgment as rendered, since all of the parties who had an interest in the same are represented in the suit."

This was approved by the Supreme Court. 238 U. S. loc. cit. 604, 35 Sup. Ct. 844, 59 L. Ed. 1478. It may be that the rule would have been different if there had been separate actions by each of the corporations, claiming different amounts, and these actions had been consolidated. But there was only one action for one gross sum.

[19] 14. Assignments 183 and 184 attack the action of the court in adding to the damages assessed by the jury interest from the date the property was destroyed to the day of judgment, and trebling that interest.

The motion of plaintiffs for interest was filed 4 days after the verdict had been returned and judgment entered thereon, and the order of the court correcting the judgment, which had been entered on the verdict of the jury, was made 11 months after the entry of the judgment. This, in our opinion, was error. The allowance of interest in actions of tort is discretionary with the jury. In Eddy v. La Fayette, 49 Fed. 807, 1 C. C. A. 441, this court held that an instruction on the measure of damages, in an action for a tort by a railway in negligently setting fire to property, to award interest, was error. The Supreme Court, in affirming the judgment (163 U. S. 456, 467, 16 Sup. Ct. 1082, 1086, 41 L. Ed. 225), said:

"Undoubtedly the rule, in cases of tort, is to leave the question of interest as damages to the discretion of the jury."

Other cases in point are Lincoln v. Claflin, 74 U. S. (7 Wall.) 132, 139, 19 L. Ed. 106; The Scotland, 118 U. S. 507, 6 Sup. Ct. 1174, 30 L. Ed. 153; De La Rama v. De La Rama, 241 U. S. 154, 159, 36 Sup. Ct. 518, 60 L. Ed. 932, Ann. Cas. 1917C, 411; District of Columbia v. Robinson, 180 U. S. 92, 107, 21 Sup. Ct. 283, 45 L. Ed. 440; Arnold v. Horrigan, 238 Fed. 39, 47, 151 C. C. A. 115. And this is the settled rule established by the Supreme Court of the state of

Arkansas, where the tort was committed and the action tried. Watkins v. Wassell, 20 Ark. 420; Crow v. State, 23 Ark. 684, 694. In no event can the court add interest to the verdict of the jury, when the jury had failed to allow interest, whether the action is ex contractu or ex delicto. Hallum v. Dickinson, 47 Ark. 120, 126, 14 S. W. 477; Ark. & La. Ry. v. Stroude, 82 Ark. 117, 127, 100 S. W. 760; McDonough v. Williams, 86 Ark. 600, 608, 112 S. W. 164; Minot v. Boston, 201 Mass. 10, 86 N. E. 783, 25 L. R. A. (N. S.) 311; Dyer v. Combs, 65 Mo. App. 148. Nor is there anything in the Sherman Act which changes this rule.

Thomsen v. Cayser, 243 U. S. 66, 37 Sup. Ct. 353, 61 L. Ed. 597, Ann. Cas. 1917D, 322, relied on by defendants, is not in point. In that case the jury, by its verdict, allowed interest, but failed to compute it. The verdict of the jury was "for the plaintiff in the sum of fifty-six hundred dollars, with interest." Interest having been awarded by the jury, the computation was merely ministerial. Cooper v. Hill, 94 Fed. 582, 36 C. C. A. 402, was an action in equity, and the chancellor in his discretion allowed interest, as the jury may have done in this case, but refused to do so. None of the authorities cited by counsel sustains the contention that in an action for a tort the court may allow interest, when the jury had failed to do so. In equity and admiralty, the court, in assessing the damages, acts as a jury, and therefore such cases are not in point.

As the amount allowed for interest is fixed, this error may be corrected without remanding the case for a new trial, by permitting the defendants in error to enter a remittitur for that sum. As this is the only error in this cause, defendants in error will be permitted to file a remittitur in the court below, within 40 days from the filing of this opinion, for the interest allowed, and upon filing a certified copy of such remittitur with the clerk of this court the same will be affirmed; otherwise, it will be reversed, with instructions to grant a new trial.

HOOK, Circuit Judge (dissenting). After the jury had deliberated without result for about two days, the trial court of its own motion recalled and charged them in a way that soon produced the verdict. Parts of this charge will be presently set forth. Having in mind the constitutional relations between court and jury, and their practical relations as well, I cannot escape the conviction that the language employed by the court was so forcible that it virtually coerced the verdict. That should never occur where the state of the evidence requires its submission to a jury, however unequal in weight the court may regard it. The power of a court to comment upon the evidence and to assist a jury in performing their duties is one of the most valuable features of the practice in the courts of the United States, and its exercise almost always makes for right and justice. But, however strongly a court may feel in a case that should properly go to the jury, the power to comment and assist them is not a power to direct a verdict, and the distinction should always be observed. Words often take compelling force from the authority of him who utters them; and when he may, but should not, command, he must be most careful with advice. The Supreme Court has said:

"It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling." Starr v. United States, 153 U. S. 614, 626, 14 Sup. Ct. 919, 923 (38 L. Ed. 841).

And upon the same subject this court said:

"But his comments upon the facts should be judicial and dispassionate, and so carefully guarded that the jurors, who are the triers of them, may be left free to exercise their independent judgment." Rudd v. United States, 97 C. C. A. 462, 173 Fed. 912.

It should be borne in mind that the trial court did not regard the case at bar as one for a directed verdict against the defendants, nor do my Brothers hold differently in the foregoing opinion. It was a case for the jury, and if in effect the verdict was directed by the court, error was necessarily committed.

In the foregoing opinion the exceptions to the charge are held insufficient to raise this question. The exceptions might have been more specific, but I think the intention of counsel was sufficiently evident, and that the trial court understood it. But whether this is so or not is not now decisive of our duty. A recent amendment of section 269 of the Judicial Code, approved February 26, 1919 (40 Stat. 1181, c. 48), provides:

"On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, in any case, civil or criminal, the court shall give judgment after un examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties."

The matter under discussion was of vital importance and is well within the above provision. It was not an inadvertence or casual ruling in the progress of the trial, to which specific objection or exception was necessary to inform the court and give it opportunity for correction, but it was a deliberate action, going to the very root of the judgment now under review. In view of the above I will now set forth parts of the charge, the italics being mine:

"*I want to say to you that the court has no thought at all of discharging you. You were sworn upon your oaths to do your duty as jurors. In the opinion of the court there is no reason on earth why reasonable men*, with a due regard for right, and each having due respect and consideration for the other's opinion, *should not arrive at a conclusion in this case.* What would be a fortune to either of you, or [to me], has already been spent and *a failure to render justice in this* and other [cases] *is what brings the courts into contempt.* * * * *And you are advised that this court is of the opinion that* the facts in this case justify you in *the conclusion overwhelmingly* that it was the policy, and therefore the agreement, for years of this national organization to prevent mining of nonunion coal for the unlawful purposes named in this complaint that it might not come into competition with union-mined coal; *that there is no question in this court's mind but that* that strike was ordered down there for that purpose to prevent the mining of nonunion coal in these plaintiffs' mines; that the strike was called by those who were the instrumentality of the greater organization, the general organization, the defendants, and their act was its act, and that they put into motion the force that destroyed this property. * * * *Why, this court has not a thought that* there would ever have been any trouble there if it had not been for the prevention of the mining of nonunion coal. *Now, that is the judgment of this court,*

*and if it were my duty to decide it I would decide it here.* \* \* \* If there is any question about the law on the responsibility for this, responsibility of the greater organization, that is for the higher court to say; but you cannot reach it until you have done your duty—*you are the stumbling block in the way and this whole time is wasted.* Now, after I have said what I have, I am going to say that *I have no thought of discharging you; you must return a verdict in this case.*"

Of course, the court said it was for the jury to determine the facts, and that they were not bound by its opinion, etc.; but are not such expressions wholly futile in the compelling force of the above? There are occasions in which the statement of a principle of law is but an academic formula. Can it reasonably be said, after such a charge, that the jury felt free to exercise their own independent judgment? The question whether the well-established province of a jury is invaded is to be judged by the natural effect of the charge upon the minds of the jurors. How did they feel about it? Did they feel free to exercise their functions independently, or were they constrained by the intrusion of the personality and power of the judge, and the fear of his displeasure, ridicule, or contempt? In this case they were reminded of their oaths; they were told that they would not be discharged, but had to return a verdict; that there was no reason on earth why they should not agree; that failure to render justice would bring the court into contempt; that there was no question in the mind of the court about the evidence; that it was overwhelmingly one way, meaning against the defendants; and that they were a stumbling block in the way of the final determination of the legal responsibility for the acts charged. It is regrettable that this incident occurred, for up until that time the case was most admirably and carefully tried.

In my opinion the judgment should be reversed.