**MOBILE GAS CO. v. PATTERSON et al., Alabama Public Service Commission.**

(District Court, M. D. Alabama, N. D., at Montgomery.   October 31, 1923.)

1. **Gas ⬅14(1)—Books of public utility assumed to be correct.**

It is not necessary that each item of a public utility's account, extending over a period of many years, should be scrutinized to determine the historical value of the plant, but, in the absence of evidence to the contrary, the books of the utility will be assumed to be correct.

2. **Eminent domain ⬅124—Valuation based on value of earlier date should allow for increased value due to rising markets.**

When the property of a citizen is subjected to a public use at a particular time, the owner is entitled to compensation based on the value of the property at the time it is subjected to public use, and, if this value is determined by its value at a former date, there should be added thereto the increase of value since that time by reason of rising markets.

3. **Evidence ⬅571(7)—Expert opinion as to what evidence shows concerning value of gas plant held of little value.**

Expert opinion as to what the evidence shows concerning the value of a gas company's plant is if admissible at all, of little value.

4. **Gas ⬅14(1)—Determination of historical value of property permissible.**

That a gas company did not preserve records showing detailed costs of property purchased many years before *held* not to preclude the court from determining the historical value of the property.

5. **Gas ⬅14(1)—Property presumed worth consideration paid.**

In the absence of evidence to the contrary, in a proceeding involving rates the reasonable presumption is that purchasers of a gas plant received a fair value for the consideration paid.

6. **Gas ⬅14(1)—Present reasonable value of property basis for rates.**

The present reasonable value of property of a gas company is the proper basis for determining whether the rates are compensatory or confiscatory, and in determining this value the original cost of the property is of little or great evidential value, depending on whether the purchase was made at a remote or recent period and other circumstances.

7. **Gas ⬅14(1)—Going concern value allowed in fixing rate base.**

When "going concern value" of a gas company is properly established by evidence, it should be considered in determining the rate base.

8. **Equity ⬅186—Allowance of going concern value, included in valuation of plant asserted as correct in pleading, held conclusive on Public Service Commission.**

Where a Public Service Commission in fixing the value of a gas company's property included a going concern value of a certain amount and thereafter, in a suit to enjoin enforcement of a rate as confiscatory, the answer asserted that the valuation was correct, its valuation of the going concern value was conclusive on it.

9. **Gas ⬅14(1)—Evidence held to sustain allowance for working capital included in valuation for rate-making.**

In a suit to enjoin enforcement of gas rates as confiscatory, evidence *held* sufficient to show that gas company was entitled to an allowance of $110,000 for working capital to be included in the valuation of its property.

10. **Gas ⬅14(1)—Right to income on necessary working capital.**

The income to which a gas company is entitled must include an income on so much working capital as it, in the ordinary course of its business, is compelled to have and does use in the conduct of its business, but which is not included in the inventory of its physical properties.

11. **Gas ⬅14(1)—Valuation for rate-making held confiscatory.**

A Public Service Commission's valuation of a gas company's property for rate-making purposes allowing only one-half of the increased value

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of the reproduction cost over the original cost before the World War, with a view of dividing the increased valuation, because of rising markets, about equally between the utility and the rate payers, is confiscation of the utility's property to the extent of one-half the increased value.

**12. Gas ⚷14(1)—Evidence held to show valuation too low.**

In a suit to enjoin enforcement of gas rates as confiscatory, evidence *held* to show that valuation of $1,700,000 by Public Service Commission as a basis for the rates was too low, and that the fair valuation was $2,000,000 plus proper allowance of at least $200,000 as going concern value.

**13. Gas ⚷14(1)—Valuation of property of gas company by Public Service Commission creates contract with state.**

Under Public Utility Act Ala. Oct. 1, 1920, the valuation by the Public Service Commission of the property of a gas company, at its request and its expense, constituted a contract with the state that it should be the permanent basic value of the property in its then condition for all future rate-making purposes.

**14. Gas ⚷14(1)—Contract fixing permanent basic valuation binding on state until expenses of fixing valuation are returned by state.**

Where, under Public Utility Act Ala. Oct. 1, 1920, providing that if a utility demands a permanent basic valuation of its property for rate-making purposes it must pay the expense thereof, the state demanded and received payment for the expenses of valuing property of a gas company, the state could not repudiate the contract fixing the permanent basic value as unauthorized without returning the consideration received.

**15. Gas ⚷14(1)—Legal interest presumed fair rate.**

In a suit to enjoin enforcement of gas rates as confiscatory, the legal rate of interest, in the absence of a contract, is presumed reasonable, especially where evidence shows it does not exceed a fair rate.

**16. Gas ⚷14(1)—Evidence held to show basis for estimates of future business.**

In a suit to enjoin enforcement of gas rates as confiscatory, evidence *held* to show that the operations during the year 1922, which but for the previous year, was the best year of the corporation's business existence, furnished the most reliable basis for estimating its business in the future.

**17. Gas ⚷14(1)—Depreciation allowable for rate-making.**

In determining the allowance for depreciation reserve of a public utility for the purpose of fixing basic rates, allowance must be made not only for the best units which will survive and be on hand at any given time in the future, but provision should also be made for replacement of poor units which will be sooner consumed or discarded as uneconomical.

**18. Gas ⚷14(1)—Depreciation held not excessive.**

A depreciation reserve of 2.5 per cent. to cover future obsolescence, inadequacy, and depreciation of the property of a gas company *held* not excessive.

**19. Gas ⚷14(1)—Expense of resisting rate part of operating expenses.**

The expense of a gas company in resisting a rate on the ground that it is confiscatory may be amortized as a part of its operating expenses, especially where it is found that the rate is confiscatory.

**20. Gas ⚷14(1)—Loss due to confiscatory rate may be amortized.**

A gas company is entitled to amortize losses incurred because the rate fixed by the Public Service Commission was too low.

**21. Gas ⚷14(1)—Allowance for contingencies held proper operating expense.**

An annual allowance for contingencies, such as injury by storms, fire, etc., in addition to a depreciation reserve, *held* a proper operating expense of a gas company.

---

⚷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

22.. Gas ⚙⇒14(1)—Expense of procuring leases for natural gas not allowable.
Expenses of procuring leases for development of natural gas wells, which were necessarily speculative, *held* not a proper operating expense to be amortized in fixing rates.

23. Gas ⚙⇒14(1)—Small contributions to charities properly charged to operating expenses.
Relatively small contributions by a gas company to local charities, etc., *held* not improperly charged to operating expenses.

24. Gas ⚙⇒14(1)—Rates permitting return of about 2 per cent. held confiscatory.
Rates for a gas company fixed by a Public Service Commission, permitting a return of only 4.59 per cent. on the value of the property of the company without taking into consideration the going concern value of which 2.5 per cent. should be allowed for depreciation, *held* confiscatory.

25. Gas ⚙⇒14(1)—Order fixing rates without finding existing rates unreasonable void.
An order of the Alabama Public Service Commission made under Public Utility Act Oct. 1, 1920, fixing rates to be charged by a gas company, but making no finding that the rates in effect were unfair or unreasonable, as required by section 31, was void.

26. Searches and seizures ⚙⇒7—Second examination of books and records of corporation held unreasonable search.
Where a State Public Service Commission had examined the books and records of a gas company for the purpose of making a valuation of its property which constituted a contract, to require the company to produce its books and records for a second examination within a few months thereafter for the purpose of repudiating its former valuation *held* an abuse of power by the Commission and an unreasonable search in' violation of Const. U. S. Amend. 4, and of Const. Ala. 1901, § 5, though future examination when changes in the company's property occur are permissible.

In Equity. Suit for injunction by the Mobile Gas Company against Andrew G. Patterson and others, individually and as members of the Alabama Public Service Commission. Injunction granted.

See, also, 288 Fed. 884, 890; 290 Fed. 476.

Harry T. Smith & Caffey, of Mobile, Ala., for plaintiff.

Harwell G. Davis, Atty. Gen. of Alabama, Hugh White, Asst. Atty. Gen. of Alabama, both of Montgomery, Ala., and F. J. Yerger, of Mobile, Ala., for defendants.

CLAYTON, District Judge. The length and strenuosity of this litigation demonstrates its importance and requires a careful consideration of the following questions:

(1) What is the reasonable value of the properties of the Mobile Gas Company which are used and useful in the public service?

(2) To what extent, if any, is the foregoing inquiry controlled by contract between the parties?

(3) Is the tariff of rates which was fixed by the Alabama Public Service Commission in its order of July 24, 1922, confiscatory?

(4) Did the Commission comply with the condition imposed by the statute as essential to the power of fixing rates? .

(5) To what extent, if any, is the right of the Commission to examine the plaintiff's properties and records affected by the terms of the supposed contract?

⚙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

First. I proceed. without reference to the alleged contract, to inquire as to the value of the plaintiff's property, which is used and useful in the public service, at the time of the filing of the original bill of complaint and ever since; and I assume, more easily, that this value will continue in the future, because if it changes so materially that the rate enjoined, which is now confiscatory, should become compensatory, the injunction may be modified accordingly. It is my understanding that the special master gave due consideration not only to the reproduction cost new, depreciated, but also to the historical cost of plaintiff's property, and, indeed, to all of the evidence which was offered before him; but as the defendants have insisted, upon their exceptions to the special master's report, that the master did not give due consideration to the historical cost of this property, I have given especial attention to this subject.

The Alabama Public Service Commission, before making the order complained of, sent its consulting accountant, Mr. Mayer W. Aldridge, to Chicago, where the general books of the Mobile Gas Company were kept, for the purpose of examining into the historical cost of this company, and in his report Mr. Aldridge recited:

"Pursuant to your instructions, I have personally examined the records and books of general account in Chicago of the Mobile Gas Company for the purpose of ascertaining the book value and historical cost of the fixed properties of the said company.

"The information desired was to be gleaned from a period of time beginning June 1, 1906, and closing December 31, 1921, and the limited time at hand necessitated a more or less general survey and not a detailed inspection and verification of every item.

"All items of both charges and credits found on the 'Plant and Franchise' account, which were in excess of $500.00, were traced to the original where possible. Under this plan the journal entries were scrutinized and the cash items were verified with the exceptions noted. As to items under the amount of $500.00, the net difference between charges and credits in the aggregate was comparatively small."

Also, he states:

"Your auditor feels that it is proper to give expression of his appreciation of the helpful and actual assistance given by the principals and employees of the company at Chicago. Especially did Mr. Page, the general bookkeeper, render timely and efficient support in procuring this data in the limited time."

[1] In Exhibit A to this report he sets forth a statement of the investment of the Mobile Gas Company in property necessary for operations, at $1,800,041.84, which does not include any working capital or going concern values. Mr. Aldridge was examined by the defendants, apparently with a view of showing that his examination of the company's books on this occasion was not thorough, because he did not trace each item to its original voucher; but it is unnecessary that each item of a public utility's accounts extending over a period of many years should be scrutinized in the testimony or by the court in order to satisfactorily determine the historical value of the plant. Such a proceeding would impose upon the court the duty of considering each item of investment over a period of many years and be as useless as it would be burdensome. In the absence of evidence to the contrary, the books of the utility will be assumed to be correct. Newton

v. Consolidated Gas Co., 258 U. S. 165, 176, 42 Sup. Ct. 264, 66 L. Ed. 538; Rowland et al. v. Boyle et al., 244 U. S. 106, 37 Sup. Ct. 577, 61 L. Ed. 1022.

[2] The utility in this instance has been doing business since 1906, keeping its books and records in the regular course of business. It was not subjected to governmental regulations until 1915, and there is no reason to suppose that its accounts were not properly and truthfully kept both prior to and subsequent to that time. The defendants themselves were members of the Alabama Public Service Commission; it was they who limited the time of Mr. Aldridge within which to make his examination, and they themselves accepted his report and acted upon it, and it seems hardly reasonable that they should now ask the court to discredit it, and especially is this true in view of the fact that Mr. Philip Page, the general auditor of the plaintiff, testified to the correctness of this report with the single exception of the fact that Mr. Aldridge omitted one item. In Book 2, pp. 15 and 16, of the testimony, Mr. Page gave the details showing the expenditures for each year, arriving at the conclusion that there was expended up to December 31, 1922, the sum of $1,800,041.44, which does not include the $100,000 which the owners of the property paid to those from whom the property was purchased, for intangibles. It further appears from Mr. Page's testimony (Book 2, p. 75) that since December 31, 1921, the company has expended upon additions to the plant $37,-955.68. Of these entire expenditures $761,142.28 was expended prior to the 1st day of January, 1915. It appears from the statement filed by Mr. I. F. McDonnell, chief engineer of the Alabama Public Service Commission, dated March 18, 1922, that the values of January 1, 1922, compare with pre-war prices as 165.8 compares with 100. The witness Dorszeski in his testimony (Book 2, p. 94) and the tabulated statement introduced in evidence as an exhibit to the testimony of Mr. Schley, all substantiate the marked increase in values between the time of the purchase of this property and the present. When the property of a citizen is subjected to the public use at a particular time, the owner is entitled to be compensated upon the basis of the value of the property at the time it is subjected to the public use, and that, if this value is arrived at by an inquiry as to its value at a former date, it is essential that there should be added thereto the increase in value since that time by reason of rising markets. Willcox v. Consolidated Gas Co., 212 U. S. 19, 41, 52, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; Potomac Elec. P. Co. v. P. U. Comm., 51 App. D. C. 77, 276 Fed. 327.

Considering the report of Mr. Aldridge, the testimony of Mr. Page as to its substantial correctness, the additions to property made since Mr. Aldridge's report, the increase in values since the property was purchased before the war, and the allowance of a working capital and a going concern value, to which I shall again refer, any effort to base a valuation of this company's property upon its historical cost would result in a large increase in the estimate of values which has been adopted by the special master and that which I have concluded really represents the fair value of the company's property.

[3, 4] A great deal has been said as to the making of deductions from this historical value by reason of certain portions of the property represented by the investment having become obsolete or inadequate, but it appears from the testimony of Mr. Page that substantially all of this property has been duly accounted for by proper credits upon the books, and there is no evidence in this case which would justify the conclusion that a sufficient amount of the property invested in by the plaintiff has for any reason been discarded or ceased to be useful and employed in the public service, to reduce the historical cost of the property to less than $2,000,000. The witness Adams, upon whom so much reliance is placed by the defendants, seems to have known nothing of the property until a short time ago; his opportunities for observation were limited to two visits to the plant in January, and his information as to the records of the company was confined to such as are in evidence before the court, and the opinions which he expresses are chiefly as to what the evidence in this case shows, which is not a proper field for expert opinion, for what the evidence may or may not show is to be determined by the court. Expert opinion, when based upon definite hypothesis, so that the court can definitely determine upon what supposed facts the opinion is based, is often of great assistance to the court; but the opinion of experts employed by either party, as to what the findings of the court should be, without any definite information as to the theories of fact upon which the opinion is based, if admissible at all, is of little or no value. The opinions of the witness McDonnell upon this subject are subject largely to the same criticism; and for the additional reasons, to which I shall again refer, are of little assistance. The defendants insist that the court cannot determine the value of plaintiff's properties for the purpose of inquiring as to the confiscatory nature of the rate, because it has produced no inventory showing the detailed properties originally purchased in 1906, or the exact form of the consideration paid therefor, and that in the absence of exact proof of the historical cost of the property in detail, it is improper for the court to undertake to pass upon the value of the property as it now stands. It is true that the plaintiff has not produced any detailed inventory of the property as it existed at the time of the original purchase by the plaintiff. The purchase was made in 1906, before there was any regulation of utilities in Alabama, and no detailed inventory of the different articles going to make up the property purchased was preserved. Such public utilities were not subjected to regulation by the Alabama Public Service Commission until many years after this purchase, and the contention that the courts cannot ascertain the value of their properties in order to pass upon the question of their confiscation, simply because they have not preserved, during all of these years, all of the detailed information which might have been of assistance in determining its historical value, cannot prevail. Courts are often compelled to reach conclusions without either party being able to produce all of the evidence that might be desirable. It appears, however, that the original purchase was made subject to an outstanding bond issue then amounting to $400,-000, and that the balance of the consideration for the physical property

was represented by the issuance of stock, which, under the laws of Alabama, could not be issued except in return for money or property at its par value, and that in addition to this the company actually paid for intangibles the sum of $100,000 in cash.

[5, 6] In the absence of any evidence to the contrary, the reasonable presumption is that the purchasers, who were looking after their own interests, saw to it that the properties purchased were fairly worth the consideration paid. It must, however, be borne in mind that the question with which we are concerned is the fair value of the property at the time as of which we are to determine whether the rate in question was compensatory or confiscatory; and that while it is proper that the court should consider the question as to its original cost, it is a mistake to suppose that the original cost of the property must in all instances be regarded as of great importance.

There is no difference in the influence which is exerted by the original cost of the property to its present owner between cases where the purpose of ascertaining that reasonable value is to ascertain whether a tariff of rates is compensatory or confiscatory, and cases in which the owner is to be compensated for his property by virtue of the wrongs of another. In all cases the question to be solved is the present reasonable value of the property. The present reasonable market value is the test which is ordinarily adopted; but where there is no established reasonable market value for any reason, the court must resort to such other methods of arriving at a just conclusion as may be available; and in determining this question much, little, or no light may be obtained from an inquiry as to what the owner actually paid for the property, according to circumstances. If the purchase has been recent and made in the ordinary course of dealings, it may serve to throw doubt upon the insistence of the plaintiff that the reasonable value of the property was much greater than the purchase price, or upon the insistence of the defendant that it is much less; but if the purchase was made at a remote period when the conditions were greatly different from those prevailing at the time of the inquiry, the original cost of the property is of little or no evidential value. While, therefore, I have yielded to the insistence of the defendants that I carefully consider the historical cost of the property here involved and have come to the conclusion that it tends rather to increase than to depreciate the proper estimate of the present value, I am constrained to believe that the light which it throws upon the subject is uncertain and would alone constitute but an unsafe guide.

[7] I have also considered the reproduction cost of the property new, depreciated, as, indeed, I have considered the entire evidence upon the subject of values. The property was originally valued by Messrs. Hagenah and Erickson, who are engineers of experience in this line of work. The work was conducted by Mr. Dorszeski, chief engineer of that firm. Their first inventory was in great detail and valued the property as of June 1, 1921, depreciated. Their second inventory and valuation was as of December 31, 1922. They valued the property as of this date, in two ways: First, upon the average of the prevailing prices for a period of five years ending December 31, 1922,

according to which the reproduction cost of the physical properties new, less depreciation, was on January 1, 1923, $1,885,202, to which they, added $110,000 for working capital and $225,000 for going concern value; second, by pricing the physical property upon a basis of the market prevailing January 1, 1923, by which they arrived at $1,-825,113, to which they make the same additions for working capital and going concern value. It appears from the testimony of Mr. Page that the plaintiff has expended in additions to its property since January 1, 1923, the sum of $37,955.68, and adding this to the smallest of the two valuations of Hagenah and Erickson, as of January 1, 1923, I arrive at a figure of $1,864,068, and adding to this $110,000 for working capital, I arrive at the sum of $1,974,068, which includes no allowance whatever for going concern value. It appears, however, that the inventory of Hagenah and Erickson omitted the right of way of a railroad which the defendant's witness, Mr. McDonnell, the chief engineer of the Alabama Public Service Commission, valued at $25,000, which must, of course, be added, bringing the reproduction cost new, depreciated, as of January 1, 1923, to $1,999,068, which does not include any going concern value. The special master expresses the opinion that a going concern value should be allowed, but he does not include this item in his valuation, doubtless in deference to the opinion which I rendered in the case of the Jacksonville Gas Co., 286 Fed. 404, where I expressed my understanding that going concern values are no longer allowable in passing upon the question of confiscation of a utility's property by the fixing of rates. This decision as applied to the facts of that case was correct, as no proof was furnished to the court from which to find the going concern value. At that time I construed the opinion in the Galveston case as excluding the allowance of all going concern values, but upon further consideration of that case, in view of the subsequent decisions of the Supreme Court of the United States, I now understand the opinion in the Galveston case as holding, not that going concern values are not allowable when proven, but simply that they cannot be proven and allowed upon the basis upon which the master had proceeded in that case, and that when the going concern value is properly established by the evidence, it is allowable. This I find to be the construction which the Supreme Court of the United States has placed upon the Galveston case. City of Houston v. S. W. Bell Tel. Co., 259 U. S. 318, 42 Sup. Ct. 486, 66 L. Ed. 961; Ga. Ry. & P. Co. v. R. R. Comm., 43 Sup. Ct. 680, 67 L. Ed. 1144.

It seems to be apparent that the value of a physical property of this kind, taken as a whole, may be much greater than the aggregate of the market value of each separate item as they are put down in an inventory or appraisal of the property, where, as in this case, there has been attached to this property a business resulting from large expenditures in advertising and working up the business in other ways. There is, doubtless, quite a difference between the good will of a business which may influence customers to prefer one concern over another in the distribution of their patronage, and a going concern value of the business which enjoys a monopoly. Good will in the sense of influence and choice between two persons engaged in the same line of

business may be unimportant where there is only one concern which has a monopoly, but it by no means follows that the business of a concern which enjoys a monopoly may not be greatly enhanced by the education of its patrons in the use of the commodity which it has to dispose of. In this case it appears that the present owners of the property paid $100,000 in cash at the time of their purchase in 1906 for intangibles, which, in all reasonable probability, had reference to this very subject. The following year after this purchase, this company disposed of 78,994,000 feet of gas, and the sales gradually increased until in the year 1922 the company disposed of 263,570,000 feet of gas, and the testimony fully explains that in order to accomplish this increase, it was necessary that this company should and that it did expend large sums of money not only in advertising in the methods which are ordinary, but in the education and gratuitous service to its patrons by way of conducting cooking schools, maintaining solicitors and teaching the public generally the use of gas in cooking, for which it was but little used in Mobile at the time of the plaintiff's purchase. The expenditures by the former owners prior to 1906 were doubtless compensated by the expenditure of $100,000 by the present owners for intangibles, but the expenditures since that time have been listed by years in the testimony of Mr. Page and aggregated $141,986.78.

[8-10] However, the question as to what the going concern value of this company's property really is has been determined by the defendants themselves. In fixing the value of the company's property at $1,969,565, which they did by their order of February 14, 1922, they allowed a going concern value of $200,000; in their order of July 24, 1922, they reduced this going concern value to $150,000; this they included in their valuation of $1,700,000, to which I shall again refer, and in the answer in this case, the defendants have set forth and insisted that their valuation of $1,700,000, which includes a going concern value of $150,000, constituted the true value of the plaintiff's property. Therefore, it seems to me that we have here, not only an admission by the defendants before this suit began which might be explained, but also an admission made in the pleading in this case, which is conclusive. I am, consequently, of the opinion that $200,000 must be added to the physical properties for going concern value. In making the figures which I have given above, I have included a working capital of $110,000, although it was allowed by the Commission and set forth by their chief engineer at $100,000. It appears from Mr. Page's testimony (Book 2, p. 77) that the average properties of the Mobile Gas Company which were not included in the appraisal as useful and actually used was on an average more than $110,000. On December 31, 1922, it amounted to $129,011.16, which consisted of—

| | |
|---|---|
| Coal on hand for the manufacture of gas | $ 19,005.89 |
| Residuals contained in the storeroom, consisting of coke, tar and ammonia | 1,318.78 |
| Storeroom, mercantile and construction | 35,242.07 |
| Accounts and bills receivable | 70,260.80 |
| Cash | 1,062.79 |
| Unexpired insurance | 2,120.83 |
| Making a total of | $129,011.16 |

It is not difficult to understand that such investments are both proper and necessary to the continued conduct of such a business and they are not ordinarily included in the inventory of property only because of the fluctuating nature of the investment, and may from time to time exceed the necessities of the business, so that the excess is not properly classable as used and useful. These properties, to the extent that they are reasonably necessary in order to enable the utility to serve the public, are just as much a part of their investment for the benefit of the public as property of a more permanent character, and my understanding of an allowance for working capital is simply that the income which the company is permitted to make must include an income upon so much capital as the company in the ordinary course of its business is compelled to have and does use in the conduct of its business, but which is not included in the inventory of its physical properties. I am therefore constrained to believe that the allowance for working capital should be $110,000, although the special master has allowed only $100,000. It is true that the witness Adams expressed the opinion that a very much smaller sum should be allowed, but as Mr. Adams had no knowledge whatever of the circumstances under which this business was conducted, his opinion upon this subject is of little value. It is also true that Mr. McDonnell, after twice allowing a going concern value at $100,-000, testified that it should be $75,000; but his change of view, to say the least of it, subtracts from the credibility of his latter estimate.

The next valuation which was placed upon this company's property was that of Mr. I. F. McDonnell, chief engineer of the Alabama Public Service Commission, which showed a reproduction cost new, depreciated, of $1,969,565, containing a working capital of $100,000 and a going concern value of $200,000. This valuation was as of December 31, 1921, and was adopted by the Commission. It was based upon an inventory prepared by Mr. McDonnell, which agreed with a previous inventory prepared by Hagenah and Erickson in a former valuation of the property as of June 1, 1921, which placed a much higher value upon the property, except that it included a right of way over a railroad at $25,000, which had been omitted by Hagenah and Erickson. This inventory was practically identical with the subsequent inventory of Hagenah and Erickson upon which they placed the value as of December 31, 1922. It appears from the undisputed testimony of Mr. Page that since Mr. McDonnell's valuation of $1,969,565, there has been added to the property $37,955.68, making in all $2,007,520.68, which is approximately the value adopted by the special master, but to which should be added the increase in values since the 31st day of December, 1921. It appears from the testimony of Mr. Dorszeski, which is not disputed, that—

"Based upon the Bureau of Labor reports. on December 1, 1921, the all commodity index number was 140. For July, 1922, when the Commission undertook to depreciate this value this index number was between 155 and 156."

It therefore follows that to determine the present value upon the basis of this report, it would be necessary to add a large sum for increase in market.

[11] The Alabama Public Service Commission having undertaken by its order of March 22, 1922, to set aside its valuation of the plaintiff's property, proceeded, in its order of July 24, 1922, to revalue the property at $1,700,000, as a basis upon which to determine the rate which it undertook to establish, against the enforcement of which a preliminary injunction was issued, and the defendants have insisted that it is this valuation that the court should adopt. This valuation is taken from a report of Mr. I. P. McDonnell, which has been offered in evidence, but which was preceded by still another valuation prepared by Mr. McDonnell, in which he undertook to value the company's property upon a basis of the pre-war prices, which resulted in an estimate of the physical property, depreciated, at $1,462,793. His third valuation, to which I have already referred, of $1,700,000, which was adopted by the Commission, as a basis for fixing the rates, was submitted to the Commission in a report containing two notable statements, which I quote:

"From this work, I was able to determine what relation my reproduction cost estimated, priced as of December 1, 1921, bore to the 1913–14 basis, which was found to be 165.85 per cent."

Again, in referring to his valuation of $1,700,000, he says:

"In effect this valuation result just about divides the increased value of the reproduction cost over the original about equally between the utility owners and the rate payers, this increase of value which arose from the increased prices of labor and material growing out of abnormal economic conditions."

This report appears to have been before the Alabama Public Service Commission at the time that it adopted Mr. McDonnell's estimate of $1,700,000, and it is hardly necessary to say that to proceed with a valuation of a utility for rate-making purposes by valuing its property at pre-war prices, and then adding thereto one-half of the increase, in prices between that time and the time of the valuation, with the view of dividing the increased valuation by reason of rising markets, about equally between the utility and the public, is nothing more nor less than an effort to confiscate so much of the company's property as is represented by one-half of the increase in market values between the pre-war period and the present time. The law upon this whole subject (rates confiscatory vel non) has been stated by the Supreme Court of the United States. Bluefield W. W. & I. Co. v. Pub. Serv. Comm., 43 Sup. Ct. 675, 67 L. Ed. 1176, decided June 11, 1923; S. W. Bell Tel. Co. v. Pub. Serv. Comm. of Mo., 262 U. S. 276, 43 Sup. Ct. 544, 67 L. Ed. 981.

In addition to this, although Mr. McDonnell purports in his statement to show how the valuation of $1,700,000 was arrived at in fixing the value of the property new, and deducting the actual depreciation from each unit, he has, in fact, done nothing except recopy his appraisal of December 31, 1921, reducing the value of each item of physical property, except the last, to .868 per cent. of his former valuation. If I am to attribute any sincerity whatever to Mr. McDonnell's statements, I must assume that the valuation which he placed upon the property December 31, 1921, of $1,969,565, which is shown by his first report and his sup-

plement thereto, of which I have already treated, really represented his honest conviction.

[12] My conclusion as to the fair value of the plaintiff's property is that at the time that the Alabama Public Service Commission put in force the rate which is alleged to be confiscatory, on July 24, 1922, the fair value of this company's property, without regard to going concern value, was, as stated by the master, $2,000,000; but there must be added thereto a proper allowance for going concern value, which, conservatively estimated, would not be less than $200,000, as originally estimated by Mr. McDonnell.

[13] Second. It is provided by the act of the Alabama Legislature, approved October 1, 1920 (Gen. Acts 1920 [Sp. Sess.] p. 38), that the Alabama Public Service Commission should have the power to value property of any public utility for rate-making purposes, and it is further provided that it should be its duty to do so upon the demand of the utility, in which event the expense thereof should be borne by the utility and that the valuation when so fixed should constitute the permanent basic valuation of the property as of the date of the valuation, for all future rate-making purposes.

Upon the hearing before three federal judges upon the application for a preliminary injunction upon the supplemental bill (290 Fed. 476, 479), I rendered an opinion, in which I expressed the view that this statute not only conferred authority upon the Commission to enter into a contract with the utility for the establishment of a permanent basic value for future rate-making purposes, but that it left the Commission no discretion whatsoever, and that when the plaintiff demanded such an examination and it was made and the state received the consideration stipulated for, the valuation became the established basic valuation as of the date thereof by contract between the parties, which the state agency may not impair. It is unnecessary that I should here repeat the contents of that opinion, to which I now refer; but I may add that much of the discussion as to the power of the Commission to enter into a contract with the plaintiff has grown out of a failure to distinguish between those cases holding that the authority of a rate-making body to bind the state to a contract establishing a tariff of rates to be charged by a public utility will not be easily implied, but must be clearly established, as for instance, in the case of the Puget Sound Traction Co. v. Reynolds, 244 U. S. 579, 37 Sup. Ct. 705, 61 L. Ed. 1325, and those cases where the state expressly authorized the making of such a contract, as, for example, in the case of Detroit United Ry. v. Michigan, 242 U. S. 238, 37 Sup. Ct. 87, 61 L. Ed. 268, and Northern Ohio Traction Co. v. Ohio, 245 U. S. 575, 38 Sup. Ct. 196, 62 L. Ed. 481, L. R. A. 1918E, 865. The difference between the two lines of cases is simply that in one the state has authorized the execution of the contract on its behalf, and is therefore bound, while in the other the state has not done so, and is not therefore bound thereby.

There is nothing whatever in either Milwaukee E. R. Co. v. Wisconsin R. R. Comm., 238 U. S. 174, 35 Sup. Ct. 820, 59 L. Ed. 1254. or Detroit United Ry. Co. v. City of Detroit, 255 U. S. 171, 41 Sup. Ct. 285, 65 L. Ed. 570, which in any wise conflicts with the views which

I have expressed. On the contrary, as stated in the former case, the right of the state to fix a rate for public service by contract has "been recognized and approved by judicial decisions." All that these cases indicate is that the purpose of the state to contract must clearly appear. Of course, it is not necessary that the state should declare in terms that it is its purpose to contract, as this purpose has been clearly stated whenever the state authorizes a Public Service Commission to do that which the courts judicially know is to contract. It seems to me that it would be difficult more clearly to express the purpose of the state of Alabama to enter into a contract definitely fixing a basic valuation than was done by the provisions of the act which are now under consideration.

In my former opinion (290 Fed. 476, 480) I cited the case of Mobile Electric Co. v. City of Mobile, 201 Ala. 607, 79 South. 39, L. R. A. 1918F, 667, and I may now cite the case of Boise Water Co. v. Boise City, 230 U. S. 84, 33 Sup. Ct. 997, 57 L. Ed. 1400, to the same effect; that is, as holding that where the franchise is limited by the state to a definite period, a contractual stipulation as to the rate of service, which fixes no period for which the contract is to continue in force, will be referred to this statutory limitation. In the case at bar, however, no question arises as to the power of the Commission to contract as to the fixing of rates. On the contrary, the only contract which is relied upon is a contract providing for the determination of a definite and existing fact, namely, the value of certain property at a certain date. The fact can never change; the difficulty of establishing it by proof may become greater or less as time goes on, but the truth as to the value of the property in its then condition, at the time of the valuation, will remain the same forever, and I know of no reason whatever why a state may not enter into a binding agreement as to the truth of any fact that may become material. Indeed, there seems to be no more reason for saying that a state may not finally determine by agreement the value of certain property as a basis for future consideration according to changed conditions, than there is for saying that no fact can ever be definitely or finally adjudicated or settled by agreement, so as to preclude future controversy, involving expense and inconvenience, where a state is a party. If there is any public policy which can be offended by a definite and final determination of an existing truth, so as to afford some permanent basis for future dealings on the part of the state, and so as to relieve the necessity for repeated and expensive investigation into the same facts, with perhaps conflicting conclusions, the reason for that policy is not apparent to me.

[14] It might also be added that wholly irrespective of whether the statute in question expressly authorized the Alabama Public Service Commission to enter into a contract for the fixing of a permanent basic value for the plaintiff's property or not, it appears from the undisputed testimony in this case that the state of Alabama demanded and received from the plaintiff more than $2,000 under the terms of a statute which provided that if the plaintiff demanded the valuation, it would be made and become a permanent basic valuation, but that the plaintiff would be required, in that event, to pay to the state the expense

thereof. The state demanded and received the money with this under-standing. If the state was not bound by the contract, then it has the right to repudiate its obligations just as any other person has the right to repudiate any obligations entered into by one without authority from him; but I know of no reason why the rule which forbids any person to repudiate the obligations of a contract entered into in his behalf, without returning the consideration which he had received thereunder, should not apply to a state with equal force as to an individual. In the case of State v. Mobile & Ohio R. R., 201 Ala. 271, 78 South. 48, the Supreme Court of Alabama quoted from the case of United States v. Willamette, etc., Co. (C. C.) 54 Fed. 807, the following language:

"No good reason can be offered why the United States, in dealing with their subjects, should be unaffected by considerations of morality and right which ordinarily bind the conscience. The defense of estoppel stands upon different ground from that of laches."

Speaking of this same subject in the case of State of Indiana v. Milk et al. (C. C.) 11 Fed. 389, the court said:

"Resolute good faith should characterize the conduct of states in their dealings with individuals, and there is no reason, in morals or law, that will except them from the doctrine of estoppel."

If the state is not bound by this contract and desires to repudiate it, it should first return the moneys which it received as a part of the consideration.

[15] Third and Fourth. Turning now to the question of the sufficiency of the rate fixed by the order of the Commission on July 24, 1922, and the net return which the plaintiff is entitled to earn, I find that the plaintiff is entitled to earn 8 per cent. per annum upon the value of its used and useful property. This is the legal rate of interest in Alabama and in the absence of contract is presumed to be reasonable in the ordinary dealings between men, and by analogy should be adopted here if there was no evidence to the contrary; but, however that may be, the evidence clearly establishes that in this case it does not exceed a fair return. The defendants now urge that the court declare that the affairs of the plaintiff have not been prudently conducted, but that they have been wasteful and must be regarded with suspicion, and that the expense of operation cannot, therefore, be estimated upon the basis of actual operations, as shown by the company's books, and that I should accept instead the opinions of Mr. Adams and of Mr. McDonnell as to what these expenses should have been. But I find in the order of the Alabama Public Service Commission, dated October 28, 1920, at which time it was considering an application of the Mobile Gas Company for a change of rate, the Commission made the following statement:

"Salient facts as shown by the evidence are summarized as follows: It is shown by expert testimony 'that the Mobile Gas Plant is beyond a doubt the best in the state,' and managed very efficiently and economically. And yet, the evidence shows that it is, and has for some time past been, operated at an actual loss, giving no return whatever to the company on its investment. * * * When the former increase was granted this company, it asked for what it expressed the hope would enable it to meet its actual operating ex-

penses until something like normal conditions could be reached, after then prevailing abnormal war conditions had passed.  *  *  *  The evidence of Mr. R. I. Speer, manager of the company, is that in order to enable the company to receive a return at the legal rate of 8 per cent. on the value of its plant, it would require an increase over the present rate of 72 cents per 1,000 feet of gas, or $2.17 per 1,000 feet, less the discount for cash."

[16] I have already referred to similar commendation set forth in the first report of Mr. I. F. McDonnell, and I find it impossible to accept the subsequent suggestions of those who indulged in this commendation, that I should now look upon these same operations with suspicion and discredit. The findings of the Commission itself are not at all consistent with the figures which the defendants now ask the court to make. The special master, in passing upon this question, refers particularly to the operating expenses of 1922, and the defendants complain of his action in accepting one year's operations as a test. I find, however, in the testimony of Mr. Page a statement of the net profits earned by this company during each year of its existence, and that the year 1922, in which the company earned a net profit of $131,-515.51, was the best year of its entire business experience with the exception of the year 1921, when the net profit was about $5,000 greater. Prior to the year 1921, the earnings of the company have never afforded a fair return upon the investment; the dividends declared by the company during the entire 17 years of its operations having aggregated only about $80,000, and no dividends having been declared since December 31, 1917. The question which the court must solve is as to the effect of the operations since the issuance of the preliminary injunction and the effect of operations in the future. During the World War, there was a great influx of people to Mobile, as I think it is judicially known was the case in all shipbuilding ports in the country; and both reason and experience indicate that, as conditions returned to normal, there must be a corresponding decrease in the population due to the fact that many men who were attracted to the shipbuilding centers by high wages leave to seek other employment as this industry wanes, and such I understand from the evidence has been the case at Mobile. My opinion is that it is not reasonable to suppose that the number of gas meters in use in Mobile in the near future will equal the number of gas meters in use during the period of this temporarily inflated population. It is insisted that the rate which is alleged to be confiscatory should have been put in force for experimental purposes before its enforcement was enjoined, and this course has been approved by the courts where the question of the effect of the rate is seriously doubtful, but the amount of gas sold by this company during each year of its existence is fully set forth in the testimony, and it appears from the order of the Commission itself, dated October 28, 1920, that at the low rate then existing, the company was not able to meet its actual operating expense. And it is further established that the amount of gas sold was greater after the rate was increased than it had been before. I am unable to believe from the testimony that the sales of gas in the near future could be substantially increased by the proposed reduction in rate, in the face of the facts to which I have referred as to the decrease in population, and that even if the sales could be in-

creased substantially in this way, the increase could not, in my judgment, possibly overcome the great deficiency which renders the proposed rate confiscatory. It is concluded that the operations for the year 1922 furnish the most reliable basis for the estimation of the near future that is available, and therefore find that the master properly used the figures of that year.

[17, 18] The master has found, and I also have ascertained, that the company cannot earn more than a reasonable return upon its investment even upon the tariff of rates upon which it has continued to operate; and even without the allowance of anything whatever for a depreciation reserve, or for any of the other items of allowance insisted upon by the plaintiff, and to which I shall refer, and he has therefore made only a passing reference to these items. It appears from the undisputed testimony that the proceeds of the sale of gas during the year 1922 would have been reduced $39,551.58 if the sales had been made upon a basis of the rate enjoined instead of upon the basis of the rate which has been continued under the protection of the injunction, or in other words, that the net income for the year 1922 upon a basis of the rate enjoined would have amounted to $91,963.93, or 4.59 per cent. upon a $2,000,000 investment, and to a smaller per cent. when the going concern value was added. This, however, is without taking into consideration a depreciation reserve, which every utility is entitled to set up against its earnings in arriving at a just return. The defendants insist that the depreciation reserve should be 2 per cent. The witness Dorszeski states that it should be between 2.5 per cent. and 3 per cent. The property of a utility which is to be valued represents, of course, the property which remains on hand at the time of the valuation which may easily be examined so as to determine the amount of depreciation that has in fact occurred in those particular units which have survived. It takes no account whatever of property discarded, whether from obsolescence, inadequacy, advancements in the art, or any other cause. When, however, depreciation reserve is considered, allowance must be made not only for depreciation of the best units which will survive and be on hand at any given time in the future, but provision should also be had for replacements of the poor units which will be sooner consumed or discarded as no longer economical. The proposition does not differ materially from the matter of life insurance, where it is plain that the average life of a given number of individuals will be less than the life of those individuals who outlive the others, from which it follows that the average premium necessary to provide the funds with which to pay the loss upon each life must be much higher than the premium which would be necessary to provide indemnity to the individual who would, in fact, live beyond his normal expectancy. In the same way, the annual depreciation suffered by those parts of a gas plant which will survive is necessarily much less than the average depreciation which will be suffered by the whole, including those parts which will perish or have to be abandoned for economic reasons. So I cannot accept the defendant's conclusion that the depreciation reserve intended to provide a fund for the restoration of all parts of the gas plant as they perish or become inadequate or

unavailable for any cause should be estimated at the same percentage as the depreciation which has actually occurred in those particular units which have survived the others. My conclusion is that a depreciation reserve of 2.5 per cent. to cover future obsolescence, inadequacy, and depreciation is very conservative. A depreciation reserve of 2.5 per cent. upon $2,000,000 is $50,000, and deducting this, I find that the net earnings available for dividends would be reduced to $41,963, which is 2.09 per cent. upon a valuation of $2,000,000, and a less per cent. when going concern value is added. Indeed, it represents only 2.46 per cent. upon a valuation of $1,700,000 insisted upon by the defendants. Moreover, there are several other reductions which the plaintiff insists should be made before ascertaining the balance of earnings available for dividends, which are entitled to grave consideration.

[19] It appears from the testimony of Mr. Harry T. Smith that the expense incident to the plaintiff's effort to resist the imposition of the rate which I find to be confiscatory will probably approximate the sum of $25,000. It is unquestionably a part of prudent business on the part of a utility to resist the imposition of any rate which it may have reasonable ground for believing to be confiscatory. This is true even if it is finally adjudged that the rate is not confiscatory, provided only the resistance is in good faith and is justified by reasonably prudent judgment in the ordinary conduct of business, and there can be no question of the right of the utility to incur such expense as a part of its operating expense, where, as in this case, the rate resisted is adjudged to be confiscatory. It is unnecessary to pass upon the amount of this allowance, as the conclusion of confiscation is clear without it. The question as to the period over which such an expense should be amortized is a question of judgment, and I am of the opinion that a period of five years is appropriate.

[20] The rate which was in force on August 21, 1920, was admittedly insufficient to afford a reasonable return. This fact was recited in the order of the Commission dated October 28, 1920, by which the rate was established. On August 12, 1920, the company filed a new schedule, but the Commission suspended its operation until November 1, 1920. On October 28, 1920, the Commission rendered an opinion stating, in effect, that the rate they had suspended was, in itself, insufficient to afford a reasonable return, but expressing the hope that within a few months changed conditions might make it reasonable and adequate. It therefore appears that from August 12, 1920, to November 1, 1920, the Alabama Public Service Commission imposed upon the plaintiff a confiscatory rate. Further, the evidence shows without dispute that the loss entailed, that is to say, the difference between the profits actually earned under the rate which the company was thereby forced to continue to use and the amount which it would have earned between August 12, 1920, and November 1, 1920, if it had been allowed to install the rate which it undertook to install on August 12, 1920, and which it was allowed to install only from November 1, 1920, amounted to $27,025.77. This loss having been imposed by the direct action of the Commission in compelling the

plaintiff to continue to operate at a confiscatory rate between these dates, the company is entitled to reimbursement of these losses, which should be permitted by amortizing them over a period of five years. This view of the subject was taken by the Michigan Public Utility Commission in the case of Michigan State Telephone Company, in volume 4, p. 564, Public Utility Reports, June 7, 1921, and again in the following cases: Petersburg Gas Co. v. City of Petersburg, 132 Va. 82, 110 S. E. 533, 20 A. L. R. 542, In re Long Island Lighting Co., Case No. 8,188, P. U. R. 192B, No. 1, p. 2; and In re Hoosier Tel. Co., P. U. R. 1920E, p. 513.

The plaintiff also contends that it is entitled to a further deduction of $7,000 per annum on account of the amortization of bond discounts. It seems that the Commission itself allowed the amortization of the expense of disposing of one bond issue, but declined to allow the amortization of the expense incident to the other bond issue of the company, which is still outstanding. The authorities are in conflict as to the allowance of this item, and I find it unnecessary to pass upon this question, as in this case the rate is clearly confiscatory regardless to this item. I may say that the same principle must prevail as to the expense incurred in the disposition of each bond issue, and if, as the Commission found, the expense of one bond issue was allowable, then the same principle should prevail as to the expense of the other bond issue.

[21] The plaintiff also contends that it is entitled to an allowance for contingencies, and the evidence tends to show that $6,000 per annum is a proper allowance for this item. No manufacturing business can be prudently conducted without a provision for contingent expenses which cannot be foreseen, and which may cost either more or less than the estimate provided. This item is ordinarily allowed, and, indeed, the statute creating the Alabama Public Service Commission expressly requires its allowance. The defendants insist that this item is included in the depreciation reserve. It is immaterial under what name this item is cared for, but the evidence tends to show that about $6,000 per annum is a reasonable allowance for this purpose. If it is to be included under the head of "Depreciation Reserve," this is a complete answer to the defendants' contention that the depreciation reserve should be limited to the average depreciation of the plant under normal conditions. This is apparent not only because of contingencies such as injury by storms, fires, and the like, extraordinary in their character, that cannot be calculated, but also because some contingencies, such as liability for personal injuries and the like, have nothing to do with the depreciation of the property. The fact that there are contingencies which must be provided for seems to make it certain that if nothing is separately set apart on this account, the depreciation reserve must be proportionately increased.

[22] The plaintiff also contends that it is entitled to amortize the expense which it incurred in procuring certain leases for the development of natural gas. It appears that at the time this expenditure was made there was in the vicinity of Mobile one or two flowing gas wells which had been burning for a considerable time, and that there was

very considerable activity in the sinking of wells for oil, and I am not prepared to say that the Mobile Gas Company did not act prudently and with reasonable business judgment in making the expenditure under discussion, but I am not satisfied that expenditures of this character, which are necessarily speculative, are the subject-matter of allowance in the fixing of a rate for the sale and distribution of manufactured gas, and therefore I do not allow this item.

[23] It appears from the evidence that the plaintiff has entered in its operating expense several thousand dollars which it devoted to local charities and small campaign contributions, a small portion of which was expended in what ordinarily appeared to be properly classed as a personal expense of the officers of the company. The question as to whether such expenditures by a public utility were justified by good business judgment may be doubtful. I do not think that contributions to political campaigns are proper as expense. It is unnecessary that I should give any extended consideration to these items for the reason that they do not amount to enough to make any material change in the result of the inquiry as to whether the rate is confiscatory. It may be observed, however, that in our highly developed civilization with its numerous complexities, good citizens, including well-conducted public utility corporations, voluntarily contribute small amounts to charity hospitals and other benevolent institutions operating as a part of the life of a given community. I see no good reason for complaint on account of the relatively small contributions to public charity made by the plaintiff, a public utility, to benevolence in the city of Mobile, whose people are noted for their philanthropy.

[24] It results from what I have said that any rate which produces a substantially smaller return than that under which the defendant is now operating would be confiscatory, and that the rate enjoined, being substantially less, is confiscatory.

[25] Fifth. Section 26 of the act under which the Alabama Public Service Commission has undertaken to establish the tariff of rates which are alleged to be confiscatory, provided:

"*Changes of Rates; Notice.*—Whenever a utility desires to put in operation a new rate or service regulation or to change any existing rate or service regulation it shall file with the Commission a new schedule embodying the same not less than thirty days prior to the time it desires to make the same effective, provided that the Commission may, upon application of the utility, prescribe a less time within which the same may be made effective. In the absence of suspension or disapproval by the Commission, as herein provided, the new rate or service regulation embodied in any such new schedule shall become effective at the time specified in such schedule subject however to the power of the Commission at any time thereafter to take any action respecting the same authorized by this act."

It appears from this record that the Alabama Public Service Commission, having previously put in force the tariff of rates under which the plaintiffs were then operating, issued a citation to the defendant on the 29th day of June, 1921, ordering it to show cause why its rate should not be reduced, and that on July 24th it proceeded to establish a new rate which is now alleged to be confiscatory. This order of July 24th made no finding to the effect that the rate in effect is unfair,

unreasonably unjust or inadequate, or unjustly discriminatory, or unduly preferential, or unfairly competitive as required by section 31 of the act as a condition precedent to its fixing and ordering a new rate. So that the question is presented as to whether a finding as to the character of the then existing rate is unfair was essential to the jurisdiction of the Commission to order the substitution of a new rate.

This question was directly presented to the Supreme Court in the case of Wichita R. & Light Co. v. Public Utilities Comm., 260 U. S. 48, 43 Sup. Ct. 51, 67 L. Ed. 124. Section 20 of the act there under consideration appears from the opinion in that case to be substantially the same as section 26 of the Alabama statute. The provisions of section 31 of the act of Alabama are substantially to the same effect as the provisions of section 16 of the Kansas Act (Laws 1911, c. 238) under consideration in the Wichita Case. The provisions of section 28 of the Alabama statute are substantially the same as the provisions of section 13 of the Kansas statute. Considering these provisions the court said:

"The proceeding we are considering is governed by section 13. That is the general section of the act comprehensively describing the duty of the Commission, vesting it with power to fix and order substituted new rates for existing rates. The power is expressly made to depend on the condition that after full hearing and investigation the Commission shall find existing rates to be unjust, unreasonable, unjustly discriminatory, or unduly preferential. We conclude that a valid order of the Commission under the act must contain a finding of fact after hearing and investigation, upon which the order is founded, and that for lack of such a finding, the order in this case was void."

If my understanding of the Wichita Case be correct, the order of the Alabama Public Service Commission fixing the rate which is alleged to be confiscatory is void, not only because the rate fixed is confiscatory, but because the Alabama Public Service Commission did not comply with the statutory requirements as to finding the former rate to be unjust, etc.

[26] Sixth. After the parties had entered into the contract fixing the sum of $1,969,565 as of December 31, 1921, as a permanent basic valuation of this company's property as of that date for all future rate-making purposes, the defendants, acting as members of the Alabama Public Service Commission, undertook to force the plaintiff to submit its entire properties and records to another searching examination, although its chief engineer had but recently made a complete examination of the entire properties of this company at a large expense to the company, and its consulting accountant had been afforded a complete opportunity for the examination of the company's books so far as the value of the company's properties was concerned. And the supplemental bill in this case was brought upon the theory that the plaintiff is entitled, under the provisions of the Constitution of the United States, to protection against unreasonable search of its properties and records; and that although the Alabama Public Service Commission has full power and authority to examine the records of a public utility, for the purpose of valuing its properties, when this matter is open, and also for the purpose of properly regulating the conduct of its affairs, any further search of the same property for the purpose of attempting to im-

pair the contract already entered into fixing a permanent basic value of this company's property is unreasonable and is, therefore, prohibited by the provisions of the Fourth Amendment of the Constitution of the United States. Whatever wrongs the Alabama Public Service Commission may have done towards the plaintiff, its power for proper regulation of this company continues and must not be impaired, but a repeated examination of the same thing without a legitimate purpose cannot be classed as a proper regulation. This matter was fully guarded by the terms of the act approved October 1, 1920, by limiting the power of examination to matters which were pertinent to some investigation pending before the Commission; but the Legislature of Alabama undertook, by an amendment of this statute, approved February 13, 1923, to destroy this limitation, and to authorize the Alabama Public Service Commission to make repeated searches through the same properties and accounts of the utility whenever the Commission might deem it in the public interest that such examination or inspection should be made. A minute examination of all of the properties of a public utility in a search through its entire accounts for the purpose of ascertaining the original cost of each item of its property must in the very nature of things involve a serious interruption of a utility's business and the entailment of a considerable expense. Such inconvenience and detriment must be submitted to by public utilities wherever there is any just reason for such examination, but they are not wholly beyond the pale of constitutional protection against unreasonable search. Almost immediately after the Alabama Public Service Commission had caused its engineer to examine every item of the plaintiff's property and had compelled the utility to submit its books and accounts to as full an examination by the Commission's auditor as he pleased to make, for the purpose of arriving at the true value of the utility's property, at an expense to the utility of over $2,000, and after the only question upon which such examination could throw any light had been definitely settled by contract between the parties, the further effort of the Commission to compel the utility to submit to another search and examination of its properties and books by another engineer and auditor for the purpose of repudiating the valuation of the company's property which the Commission had made, and which had been established by contract, appears to me to be in defiance of section 5, of the Constitution of Alabama 1901; and it was because such additional examinations were deemed unreasonable that the preliminary injunction was ordered by the three federal judges passing upon this question. 290 Fed. 476, 478, 479.

The re-examination of this company's entire properties and records, which has been demanded by the Alabama Public Service Commission while nothing whatever is pending before that Commission and apparently for the sole purpose of undertaking to repudiate the Commission's own valuation upon the property which has been fixed by contract, constitutes an unreasonable search prohibited by the Fourth Amendment of the Constitution of the United States. I have fully discussed this question in a previous opinion (288 Fed. 884, 887), rendered upon the motion of the defendants to require the plaintiff to file

all of its books, accounts, and documents for their examination. Hale v. Henkel, 201 U. S., 43, 26 Sup. Ct. 370, 50 L. Ed. 652; Essgee Co. of China v. United States, 262 U. S. 151, 43 Sup. Ct. 516, 67 L. Ed. 917; Carpenter v. Winn, 221 U. S. 533, 31 Sup. Ct. 683, 55 L. Ed. 842; Gen. Film Co. v. Sampliner, 232 Fed. 98, 146 C. C. A. 287; Rawlins v. Hall-Epps Clothing Co., 217 Fed. 884, 133 C. C. A. 594; Oro Water Co. v. City of Oroville et al. (C. C.) 162 Fed. 975; United Mine Workers of America v. Coronado Coal Co., 258 Fed. 829, 169 C. C. A. 549; Caspary v. Carter (C. C.) 84 Fed. 416.

The condition of the utility's property will change more or less as time goes on, other essentials will doubtless be added, and the operations of the company will remain under the Commission's regulations, and so far as may be necessary for the ascertainment of facts which are relevant to these questions, the power of the Commission to examine the properties and accounts of the utility remain in their full force and vigor, but I think that it is a clear abuse of this power to attempt to put the utility to the expense and burden of submitting its properties and accounts to a further examination for the purpose of reviewing that which has already been ascertained or settled by contract.

It follows from what has been said that the exceptions to the master's report must be overruled, and that relief must be granted under both the original and the supplemental bill. There is, therefore, no occasion for passing upon the motion to dissolve the preliminary injunction, which is now, upon motion in open court, to be made permanent.

A decree will be entered in harmony with what has been said.